(No. 4627–)

ROBERT G. HANVEY, JR., AS ADMINISTRATOR OF THE ESTATE OF PATRICIA ANNE HANVEY, DECEASED, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed January 8, 1957.*
*Petition of claimant for rehearing denied April 26, 1957.*

FRANCIS V. FLASKA AND MARVIN E. LARSON, Attorneys for Claimant.

LATHAM CASTLE, Attorney General; MARION G. TIERNAN, Assistant Attorney General, for Respondent.

FEARER, J.

Claim was made by Robert G. Hanvey, Jr., as Administrator of the Estate of Patricia Anne Hanvey, deceased, for the wrongful death of his wife, which occurred while she was a patient at the Kankakee State Hospital, Kankakee, Illinois, on June 12, 1953, at or about the hour of 1:00 P.M. At the time of her death she was 24 years of age, and left as her sole and surviving heirs at law Robert G. Hanvey, Jr., her husband, and two minor children, Michael Robert Hanvey and Catherine Hanvey, three and two years of age, respectively.

No answer having been filed by respondent, a general traverse of all of the allegations of the complaint and amended complaint is considered under our Rules.

The case was heard by Commissioner George Presbrey. At the onset of the trial there was offered in evidence as exhibit No. 1 a plat of the hospital grounds,

drawn to scale, showing the location of the buildings housing the patients, and the location of the Kankakee River running adjacent to the buildings housing the mentally ill patients.

A stipulation was entered into by the parties, by and through their respective attorneys, to the effect that four patients had drowned in the Kankakee River between the years of 1949 and 1953.

Patricia Anne Harvey became mentally ill in June of 1952 after the birth of her second child, Catherine. She had been visiting with her parents, Dr. and Mrs. Jackson of Topeka, Kansas.

Prior to her marriage in September of 1948, she was educated at Antioch College, and, as a part of her education and college training, was sent to Chicago to work at the Museum of Science and Industry, and also at the Field Museum. A portion of her time was spent in residence in Yellow Springs, Ohio, and the rest of the time she spent in Topeka, Kansas with her parents.

Six weeks after her child was born she left Topeka, Kansas, and moved to Chicago to be with her husband.

Up to the time of her mental illness, she was apparently a healthy, well-adjusted individual. There were no signs of her mental derangement until after she returned to Chicago, where she and her husband lived with her husband's parents, while he was attending school.

Her first suicidal tendencies became apparent on November 21, 1952, when she jumped from the window of a bedroom, and, as the result thereof, suffered fractures of the vertebra, arm and heel. She was taken to the Jackson Park Hospital for treatment for said injuries, and, while a patient there, early in December of 1952, attempted suicide with a rope taken from a restraining jacket. It then became necessary to remove

her from the Jackson Park Hospital to the Cook County Psychopathic Hospital, which was on December 3, 1952. She remained in the Psychopathic Hospital for only one week, and was then committed to the Kankakee State Hospital on December 10, 1952.

From the Departmental Report filed in this case, and from the evidence offered by both claimant and respondent, it is apparent that upon her admission to the State Hospital she was out of contact and extremely depressed. She was confined to the hospital ward due to the fractures she sustained when she jumped out of the window. Due to her physical condition, it was impossible to administer electric shock treatments, but instead her treatment was confined to subcoma insulin, and she was further treated for her physical injuries. A gradual improvement was shown, and she was transferred off the acute hospital ward on February 26, 1953. She was classified schizophrenic reaction, acute undifferentiated type. On April 8, 1953, she was granted ground privileges. She also worked on the hospital paper as a reporter, and spent a great deal of her time in the library, had visits with her parents and husband, and on several occasions was taken by her husband into Kankakee visiting parks, eating meals away from the hospital, and apparently was on the road to recovery.

On or about May 1, 1953, those in attendance noticed that she was becoming more nervous and restless, and was crying frequently. She was then transferred to the acutely disturbed ward, because of the possibility that she might have suicidal ideas. Within a short time, upon showing a marked improvement, she was transferred to a better ward, and her ground privileges were returned.

She was under the care of Dr. Ring, who testified that she had never expressed to him the thought she would

commit suicide. However, both of Patricia's parents testified that Dr. Ring had said he felt that she had, and also had expressed suicidal tendencies. Dr. Ring also testified that he did not consider her condition sufficiently improved to warrant transferring her to an open ward where a safeguard would not be present.

In the week of June 8, 1953, Dr. and Mrs. Jackson visited their daughter, and consulted with the hospital authorities relative to the advisability of moving Patricia to the Menninger Foundation at Topeka, Kansas, as they had been advised by Dr. Louis Robbins that he would like to make an evaluation of her case at the clinic. They talked to Dr. Ring about this, and were referred to Mrs. Kelly of the Social Service Department of the hospital. Her file was reviewed, and they were refused the right to take her back to Topeka. It was impressed upon them that it would be difficult to take her out of the state, under all the circumstances, and that the authorities at the hospital had not given up hope of her recovery. They were advised that, if she did not show a marked improvement within a comparatively short time, now that her physical injuries were improved, a similar request might be more sympathetically received. They were also advised that there was danger in removing the patient to the home or place, where the onset of her mental illness began back in 1952.

On the day of the drowning, Patricia was seen by Mrs. Branson, the nurse in charge of her ward, who, just prior thereto, was sitting on the lawn with other patients, who did not have ground privileges. Patricia came by and asked Mrs. Branson to light her cigarette. She talked with her a few minutes, and then walked across the lawn in the direction of the river. It was pointed out that the river was about 1,000 feet from where she

was quartered. She was not seen from that time on until two of the inmates found her book and shoes on the river bank, and saw her swimming around in the water, apparently swimming well. All of a sudden she screamed for help, and then disappeared. An attempt was made to row out in a boat to rescue her, but to no avail.

Claimant emphasizes: First, previous attempts of suicide; Second, the insufficiency of the staff, particularly psychiatrists, there being only one, and the fact that Dr. Ring himself was not a psychiatrist; Third, the lack of attendants patrolling the grounds, and failure to station life guards protecting patients from entering the river; Fourth, failure of the state to construct fences or barricades protecting patients; and, lastly, the negligence of respondent's agents in permitting claimant's intestate to wander about the grounds with the easy access to the river unprotected. It is contended that the consequences of her act in entering the river and drowning should have been foreseen by respondent's agents, because of her previous suicidal tendencies.

Respondent, in its brief, relies upon three points in defense of the claim:

First, respondent not only discharged its duty, but did not violate any duty owing to the deceased; Second, claimant has failed to prove any negligence on the part of respondent; and, Third, assuming that respondent was negligent, which respondent denies, such negligence was not the proximate cause of decedent's death.

It is conceded, and rightfully so, that the responsibility imposed upon state institutions, such as the Kankakee State Hospital, in the care of its patients is the same as that imposed upon non-immune-to-suit private hospitals. In this regard, our attention is called to the case of *Lovin* vs. *State of Illinois,* decided by this Court

on April 21, 1955, being case No. 4577, wherein we cited the case of *Simmons* vs. *South Shore Hospital,* 340 Ill. App. 153, in which was cited the case of *Maki* vs. *Murray Hospital,* 91 Mont. 251, wherein the court said:

"Defendant owed Martin Simmons the duty of protection, and was bound to use such reasonable care as his known condition required, but was not an insurer of his safety."

In the *Simmons* vs. *South Shore Hospital* case, supra, we quote from the court's opinion on page 158:

"The question is whether there is any evidence in the record fairly tend- ing to prove that the hospital through the techinician was guilty of violating its duty in failing to foresee, as a reasonably prudent person in the same busi- ness and with knowledge of Simmons' medical history and present condition, that it was probable that during the technicians' absence of about two minutes, Simmons . . . would have an anginal attack . . . and fall from the cart.

Plaintiff insists that some reasonable minds would infer from the favorable evidence that under the circumstances the techinician's duty was to watch the decedent while he was under her care, and be in a position to prevent his falling from the cart. . . ."

At page 159, the court concluded:

"We must not shut our eyes to the obvious consequences of imposing unreasonable burdens upon hospitals. Under a logical extension of plaintiff's view, the technician would not have been free to place the films in the tank in the dark room off the laboratory without being negligent for she would not then have been in a position to prevent Simmons from falling. We think that all reasonable minds should and would agree that the answer to the precise question is that the defendant had no obligation not to leave Simmons for about two minutes under the circumstances. . . ."

It is difficult to reconcile cases cited by claimant, and those cited by respondent in their respective briefs and reply brief. It is apparent that the courts in each case have followed somewhat the same standards as to care of patients, taking into consideration the treatment necessary for their recovery, the condition of their health, the necessity of care required, and the question of foreseeability of the natural and probable conse-

quences of their care or lack of care. This will be a concern whether a mental patient, or any other patient, committed suicide by whatever means, including drowning.

The only way that the state could protect all mental patients, regardless of the progress of improvement they had shown, would be not to grant any ground privileges, or any privileges whatsoever, as were extended to Patricia Hanvey; not to permit any patient of this kind, or any other type, privileges, because there is always a possibility that any mental patient might find some means to destroy himself; and, to keep all patients under constant surveillance. This, in our opinion, would certainly be a detrimental factor, and would impede recovery, as it is unquestionably a part of the therapy treatment as mental patients show signs of improvement and self-reliance to grant them privileges preparatory to restoring them to a natural and normal existence, which, as in her case, was permitting her to leave the grounds with members of her family, visit the library without any restraint whatsoever, walk throughout the grounds, which had been beautifully landscaped, and to even view the river and the landscaping along the edge of the water, the beauty of which adds to the institutional grounds, and could not help but assist patients in their recovery.

It is also a well known fact, which is borne out by the evidence in this case, that the doctors, nurses and social workers had treated Patricia Anne Hanvey in every way possible, and, as a part of her treatment, permitted her to have ground privileges, and to walk throughout the grounds without any restraint. To treat her case otherwise would have been unfair to her, and consequently unfair to her family. To keep her under

constant care, or confined in a ward with mental patients, who were in a much worse condition than she, which, in effect, would have been depressing to her, and would not have been conducive to her improvement and restoration to a normal life in society.

In regard to the hospital being understaffed, we must bear in mind that respondent is treating and attempting to restore to normal lives many thousands of patients, who are unfortunate and unable to pay for private institutional care, which is quite costly.

We do not believe that respondent was negligent in permitting ground privileges to Patricia, and we believe that respondent's agents made a fair diagnosis and appraisal of her case in permitting her certain privileges, even in view of the fact that she had attempted suicide on two previous occasions before being admitted to the institution. She apparently was well known, and was conversant with a great many of the employees, and certainly the nurse, in charge of mental patients on the day that she drowned, was not apparently concerned with her wandering toward the river. It may be that Patricia had not expressed to her such suicidal tendencies, since being admitted to the hospital. It possibly could be said that any mentally deranged person might have suicidal tendencies. Still we believe that, if respondent's agents had reasonable grounds to believe that a recovery in each case was being made, they certainly should not be penalized for not watching each and every patient every minute of the day when a suicidal attempt could be made, and done so in many different ways.

Respondent relies on, and has cited many times in its brief, the case of *Fowler, Et Al* vs. *State,* Court of Claims of New York, 78 N.Y.S. (2d) 860. This was a

case where claimant's intestate was confined to a State Hospital in New York. A previous atempt at suicide was made, and, during a period of convalescence and less restraint, did commit suicide. The case of *Root* vs. *State*, 40 N.Y.S. (2d) 576, was cited in the opinion. The court held, and we quote from the opinion:

"The state is duty bound to furnish inmates of its hospitals for mental defectives with every reasonable precaution to protect them from injury, either self inflicted or otherwise. *Shattuck* vs. *State*, 166 Miss. 271."

### The court continues:

"While the degree of care owing to its inmates may be more exacting because they are wards of the state and the state is the guardian of their well-being and safety, the state nevertheless is not an insurer of the safety of the inmates of its institutions. There was no duty upon the state to maintain individual and constant supervision over the deceased herein. The state's employees and physicians had knowledge of the deceased's mental condition and had classified him as a potential suicide, but the record disclosed the fact that he was not a case for isolation or for a restraining garment. He was not assigned or kept in a disturbed ward, and he had, as appears from the hospital record, shown signs of improvement, was co-operative, and had, on occasions prior to his death, made statements and indicated to the physician that he no longer entertained any thought of doing away with himself. There was nothing unusual about his mental condition to warrant having other care or treatment than was administered to him. It is not disputed that the making of beds was a form of occupational therapy, which is a method of treatment of the deceased's condition.

The attendant was in the corridor adjoining the dormitory in which the deceased and two other inmates went for the purpose of making up beds. While it is true that the attendant did not constantly have the deceased within view, there was reasonable surveillance and watchfulness on his part over the deceased and the others in that group. There was nothing about the deceased's condition to justify any reasonable perception of any risk in allowing him in the dormitory with the others making up beds.

He had done that on a number of previous occasions. Futhermore, there is no such duty on the state to maintain individual supervision for each potential suicidal case. Any such rule of law would place an unreasonable burden upon the state and the authorities in charge of insane patients, and would also be contrary to the accepted methods of treatment of such patients. It also appears from the record herein that to keep a patient cooped up in one room and to limit his activities and prevent his taking part in work, in doing something useful about the ward, is harmful; and that as patients lose or have lost their suicidal tendencies, they are given more leeway."

In the *Fowler* case, it was pointed out that there was marked improvement in the condition of the decedent, that her progress had been greatly aided by the occupational therapy rendered to her, that the hospital authorities and attendants had no reason to be apprehensive of any impending danger, that, as on prior occasions, she performed her work without cause for alarm or close surveillance, and that periodic checks were made as to her activities and whereabouts.

From the evidence in the case at bar, we believe the same could be said about respondent and its agents in the case of Patricia Anne Hanvey.

The only other contention made by claimant as pertaining to the negligence of respondent was the location of the institution along the Kankakee River. This, we do not believe is worth while to even comment on. Whereever an institution might be located, there might be many means of self destruction. Nor will we comment on the fact of the previous drownings. We do not have enough before us as to the mental condition of the patients, and the question of whether or not the agents of the state could foresee the consequences of the patients' acts, as each case rises or falls on a question of fact as to how much care each and every patient would require. And, lastly, as to the question of the construction of barricades or fences along the river bank, we are of the opinion that such measures would not have prevented Patricia Anne Hanvey from committing suicide.

The claimant also goes into the question of the amount of recovery in wrongful death cases, believing that under our statute a recovery could be had for all three next of kin, which, of course, is erroneous, as the limit of recovery in a wrongful death action is one recovery for the administrator for the benefit of the next

of kin of decedent, which in this Court is $7,500.00. It is not necessary to go into the question of pecuniary loss in cases of this kind for the reason that it is the opinion of this Court that no award should be made.

It is, therefore, the order of this Court that the claim be denied.