(No. 76-CC-2385–)

Doretha Ingram, Administrator of the Estate of Allen Ingram, Deceased, Claimant, v. The State of Illinois, Respondent.

*Opinion filed November 19, 1979.*

Goodman, Krasner & Kipnis, for Claimant.

William J. Scott, Attorney General (John R. Fanone, Assistant Attorney General, of counsel), for Respondent.

Holderman, J.

Claimant is the widow of Allen Ingram who committed suicide while a patient at the Illinois State Psychiatric Institute.

The deceased first came to the attention of the State of Illinois on September 9, 1975, when he came to the Illinois State Psychiatric Institute with his mother. At that time, he was evaluated by Gertrude Lloyd, A.C.S.W., who recommended to the patient that he voluntarily enter the hospital. He steadfastly refused and left the premises. Her evaluation is as follows:

"Mental Status: Patient is casually dressed and looks stated age. He is oriented as to place and person but there was some confusion as to dates which he corrected immediately. He was anxious and circumstantial in his productions and guarded. This was directly related to his firm effort to regain control without help from anyone."

The decedent again came to the facility on September 28, 1975 and was seen by a Dr. Harshad M. Mehta who described the patient as having been drinking. He further stated "The patient did not appear to exhibit suicidal or homicidal tendencies." He was not admitted.

The patient came one last time to the facility on September 29, 1975, and was admitted at about 8:40 p.m. He was accompanied by a friend, Juanita.

Upon admission, he was evaluated by Dr. Marshall Garrick. His admission note reads as follows:

"Mental Status: Oriented x 3." (Meaning: to time, place and persons) "Mood—sad. Denies suicidal intention. Thought processes and content, delusions, in building spying—someone trying to kill." (Note: the doctor is reporting that the patient said these things to him.) "Denies hallucinations; no looseness of associations. Coherent. Insight: feels needs rest."

Provisional Diagnosis: "Paranoid state and depression."

Prognosis: "Good. First Hospitalization."

Treatment Plan: "Admit to 5 East."

Claimant was 26 years of age, married, and the father of two children. He had been separated from his wife for approximately three months at the time of his death and, according to her story, she was afraid of him.

The hospital records indicate that he talked freely about his fears, played ping-pong and drew pictures.

The first and only morning he was in the hospital, he arose and took care of his personal hygiene and was concerned about an injury to his hand which had occurred before admission. He participated in a room change and watched television.

At about 11:00 a.m., he left the day room to go to his room and was found about 15 minutes later in his room, slumped to the ground with a belt around his neck and fastened to the door knob. He was pronounced dead at 12:15 p.m. In the interim between the time the patient was found and his being pronounced dead, he was given treatment to try to resuscitate him.

Ronald A. Moline, M.D., gave an opinion to rebut the testimony of Claimant's doctor which took into account all three meetings with the decedent, the entire hospital record, the history and hospital course. The gist of this opinion was to the effect that in none of the interviews was any information gleaned about this patient showing that he had ever attempted to harm himself in the past or that he had ideas of doing so in the present. The most prevalent thought content, which was cited by every interviewer, revolved around the fear of being harmed rather than any wish to harm himself. In only one place in the record is there any information presented which indicated that the deceased might harm himself and that was in one of the letters in an exhibit which stated that he tried to escape through a bathroom window. It is not clear, however, whether his attempt to go out the window was an attempt to elude his illusionary pursuers or whether he intended to do harm to himself.

The Court must conclude from the evidence offered that Respondent did not have any reason to believe that the deceased had any self-destructive thoughts.

In 22 Ill. Ct. Cl. 513, this Court held that Respondent owed patient "the duty of protection, and was bound to use such reasonable care as her known condition required" and in the same case held that the State "is not an insurer of safety."

Claimant takes the position that the State did not give the patient the care that was required, particularly in allowing the patient to retain his belt. See 30 Ill. Ct. Cl. 373. This case lays down the rule that the State is not an insurer of mental health patients.

Dr. Moline, in his testimony in addressing the question of "suicidal precautions," and the issue of taking decedent's clothing and belongings, made the following statements:

"Should all psychotic patients, or those diagnosed as schizophrenic, or as having affective disorder, be placed on suicidal precautions? Almost all psychiatric hospitals operate on the premise that they should not—that suicidal precautions should be reserved for those patients, regardless of diagnosis, who give evidence of suicidal inclination or propensities. Why is this? . . . The answer is two-fold:

Experience has demonstrated that individuals intent on suicide are often precisely those that give no warning of their intention. Given some clue, it is not an insuperable task for a hospital unit to provide relatively effective suicide precautions for a limited time period, including deprivation of privacy (sleeping in front of the nursing station, having an aide accompany the patient to the bathroom and be present at all times), removal of shoelaces, glasses, belts, and silverware at mealtime—although even then some individuals have proven ingenious at successfully accomplishing their aim. It is less feasible for a hospital unit to provide such effective protection and observation for many people at the same time—and almost impossible to continue, in terms of the vigilance and intensity required, day-in and day-out, as a routine policy of ward functioning.

The second consideration is more subtle, but of no less importance. Citizens who find themselves in a psychiatric hospital—by choice or involuntarily—are subject to two powerful forces which work against the restoration of mental health: demoralization, and regression. Hopefully, the good things the psychiatric hospital has to offer will offset these forces, but every aspect of hospital life which says to the patient: You are unfit to live like ordinary human beings; unfit to wear the eyeglasses you need for reading, or to hold your pants up other than with your two hands, or to be expected to take responsibility for yourself and your fellow-man—every such rule, or implication, contributes to that patient's deterioration rather than recovery.

It is my conclusion that, in the case of Mr. Allen Ingram, there was no evidence elicited of suicidal history or intentions, and that he was accordingly treated with concern but also with respect for his dignity and his rights. I believe that he was given a proper and usual psychiatric evaluation, and that he was placed on a unit with more than usual expertise in evaluating and treating patients with serious depression."

Claimant attempted to introduce into evidence certain textbooks. The Commissioner stated he was going to enter them into evidence without giving any judicial notice or any credence to how much authority these matters had. It is the Court's opinion that the introduction of the textbooks as such is in error and the only possible use of textbooks in proceedings of this kind is for use in cross-examination.

This Court has previously held that where Claimant fails to prove by a preponderance of the evidence that Respondent did not exercise the degree of care owed to its patient, the claim will be denied. See 25 Ill. Ct. Cl. 296.

It is the opinion of this Court that the treatment accorded to the decedent was the ordinary treatment given to patients in similar conditions and the State was not negligent in the care of the deceased.

Award denied.