(No. 75-CC-1180—

LUEDELLA WOODS, Individually and as Administrator of the Estate of John L. Britton, Jr., Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed September 27, 1985.*

RONALD L. CARPEL, LTD., for Claimant.

NEIL F. HARTIGAN, Attorney General (WILLIAM E. WEBBER, Assistant Attorney General, of counsel), for Respondent.

Montana, C.J.

The Claimant herein, Luedella Woods, is the mother and duly appointed administrator of the estate of John L. Britton, Jr., deceased. Mr. Britton was incarcerated in the psychiatric division of Menard Penitentiary, a State of Illinois penal institution, at the time of his death. He was found hanging in his cell there at approximately 7:20 p.m., on September 15, 1974. This claim has been brought to recover damages alleged to have been caused by the negligence of the State in the death of Mr. Britton.

The bulk of the evidence in this case was presented in a report compiled by the Department of Corrections concerning the circumstances surrounding the death. The facts, which do not appear to be in dispute, are summarized as follows.

John Britton was born in Brownsville, Tennessee, on May 9, 1945. He had several brothers and sisters, the exact number and names rather indefinite. His parents separated when he was around 14 years of age. Around 1961 he came to live with one of his brothers in Decatur, Illinois. Subsequently, his mother also moved there and was residing there at the time of the hearing in this claim. His father's last known address was also in Decatur. He was single but claimed a common law arrangement that lasted about six months. He claimed a sixth grade education. He had frequent jobs as a laborer but was often unemployed.

Prior to the offense for which he was incarcerated at the time of his death, he apparently had several minor conflicts with the law. The report indicates that his F.B.I. file reflects several arrests for minor theft charges and one charge of criminal damage to property between July of 1964 and February of 1965. On February 26,

1965, he was arrested for petty theft and received a one-year sentence. He began his sentence at Stateville Penitentiary in Joliet, but also served parts in Pontiac and Vandalia. He was released in December of 1965. Three other minor offenses are reflected from March to September of 1966. He was arrested in January of 1967 on a charge of attempted murder arising out of an incident on October 10, 1966. At a hearing he was found incompetent to stand trial and committed to the State of Illinois' Department of Mental Health. A year later he was released to Kankakee State Hospital as being mentally incompetent. On June 29, 1967, he was found competent to stand trial and released to Macon County authorities. In September of 1967 he was tried and convicted of attempted murder and subsequently sentenced to eight to 20 years in prison.

Mr. Britton began his sentence at the Joliet diagnostic department but was soon transferred to Menard to serve his sentence with the general population. He was unable to adjust at Menard and in September of 1968 he was transferred to Stateville. In February of 1970 he was again transferred, this time back to Menard but in the psychiatric division where he remained until his death.

As for Mr. Britton's life while incarcerated, the report depicts him as a severely disturbed, mentally ill, antisocial individual. It contained evaluations by several psychologists, psychiatrists, and sociologists, comments by his counselors, a nursing and medication summary, various staff observations, and a conduct report.

While serving his earlier sentence for petty theft at Vandalia, a sociologist named Alvin R. Frazier prepared a report which was summarized as follows:

"During the course of the interview subject was friendly, cooperative and readily gave answers commensurate with his ability. It is readily apparent, however, that he is unaware of the forces which combine to motivate his deviant behavior. He views the world as being hostile, aggressive and warlike, with all action taken as a means of 'getting at him.' He attempts to arrange his universe so that he is the center of it and has little concern for the rights or feelings of others. He attempted to cover up his feeling of rejection and insecurity by overt, aggressive, and abusive language and physical action. He feels that he must do this to prove himself to be a 'real man and worthy of respect.' He was in good contact as to time and space.

Although his mother has been on relief, he denied any period of extreme economic deprivation. He admits moderate to heavy use of alcoholic beverages which he seeks to use as a 'scapegoat' for his deviant behavior.

This 19-year-old inmate impresses this interviewer as being an inadequate, egocentric sociopath. He views himself as being the target of a very hostile and aggressive world with physical prowess the only means of recognition. He is extremely criminally oriented and prospects are poor for any immediate change in behavior. He will probably prove to be a constant disciplinary problem during his entire period of incarceration. He was involved in an attempted 'jail break' in Macon County and as a result of this, coupled with his emotional make up, is considered an extremely poor security risk. Without the benefit of psychometric testing, it is difficult to determine intellectual capacities; however, it is this interviewer's impression that subject has borderline intelligence."

Following his last arrest and prior to the competency hearing, a Doctor Groves B. Smith and a Dr. Baumann evaluated Mr. Britton. Dr. Smith's report was said to contain the following:

"For his own welfare and for the protection of the community, and I have every feeling of sympathy and understanding about him and his responses, I do not feel that he can be cared for in a school for mentally retarded. I have worked with these children for most of my life, I would not want the responsibility for his care during the growing up process. He is a dangerous person. He responds to kindness, and he rebels against anything which he describes as an attempt to dominate and direct his behavior. He is a major security risk in any environment in which he is put. I feel this takes precedence over illiteracy and limited training, even though he presents a picture of mental retardation."

Dr. Baumann was said to have administered several tests to him and provided the following evaluation:

"In summary, he is mentally deficient, his intelligence is so limited that he doesn't know the difference between right and wrong, particularly when

he is intoxicated. He is a dangerous person who is likely to act out again. It is our recommendation that he be placed in a mental institution or a hospital for the mentally defective where he can no longer act out his impulses. If he is not imprisoned or placed in a hospital for mental defectives, he may be expected to act out in a dangerous, hostile and aggressive manner again. This man is defective, as well as being hostile and dangerous. He should not have probation. He should be incarcerated so that he cannot inflict the damage on society."

After Mr. Britton was found not competent to stand trial, another evaluation was performed, this time at the Illinois Security Hospital in Chester, Illinois. After several additional tests were conducted, the following report was said to have been made:

"The results of the psychological examination reveal that we are dealing with a patient who is on the threshold between a borderline mental defective and a mentally defective in his verbal ability. In conclusion: Results of the psychological examination reveal that we are dealing with a mentally defective young adult who certainly, at this time, is not able to stand trial in terms of mental ability, which may be depressed due to a sociopathic syndrome. The personality assessment revealed that we are dealing with a person who has extreme difficulties in interpersonal relations in his social arena, has a serious ego disturbance and has developed a mild sociopathic syndrome. The psychometric results strongly suggest that this patient should remain in his present status in this institution with continued psychiatric observation and treatment. It is felt that a psychological reevaluation should be administered after a few months of continued treatment. It is felt also that a more comprehensive evaluation could be made after this period of time in view of the present difficulty in differentiating between the variable of mental retardedness and blocking relative to problems and situations of an interpersonal nature."

Following his sentencing on the attempted murder conviction, a Doctor Ciatteo, a psychiatrist at the Joliet diagnostic department, evaluated Mr. Britton for a special progress report. His diagnosis was, "emotionally unstable personality in a mentally defective individual. He is not mentally ill and not in need of mental treatment. He is not classified as a sexually dangerous person." However, he did agree with the other examiners that he should be classified as a dangerous person, especially with respect to his hostile and aggressive behavior, if he felt he was being badgered or

backed against the wall, or even more significantly, if he felt he was not being understood.

Just prior to his transfer from the Menard general population back to Stateville, Mr. Britton received the following evaluation from a psychologist named Meyer:

"Group II(b): Mental retardation without continuing criminal propensities. Doubtfully improvable offender—emotionally unstable, passive-aggressive, passive-dependent type. Guarded prognosis . . . *MAXIMUM SECURITY*— related to his degree of emotional instability and his inability to handle frustration in a thoughtful manner."

While back at Stateville, on May 26, 1969, an electroencephalogram was conducted and was interpreted to be within normal limits. Shortly thereafter a psychiatrist named Lorimer diagnosed Mr. Britton and it was reported that he provided the following analysis:

"The mental deficiency or mental retardation, more properly called, is felt to be possibly a combination of educational opportunity which was lacking as well as a hereditary factor . . . (Britton was) a primitive person who acts impulsively and often in an animalistic, dangerous manner in a social setting of a metropolitan community."

On July 10, 1969, Mr. Britton reportedly sought isolation from the prison environment by requesting to cell alone. A Doctor Kruglik felt that he should be permitted to cell alone until situational pressures he was feeling moderated.

On December 30, 1969, while at Stateville, the report states Mr. Britton caused a disturbance in his cell area. Britton stated that the Lord was there and that he was going to the Lord. He asked for his black brothers to accept and help him. He said that he had never been accepted by his black brothers. He was placed in the detention hospital. He resisted and several officers were required to move him. Doctor Kruglik's special progress report reflected the following comment: "Since being here, from early this morning, the inmate has been lying on the floor in the nude, refusing to eat or to shave and shower."

Another report by Doctor Ciatteo, dated January 9, 1970, pointed out additional aggressive and belligerent behavior.

On January 16, 1970, Dr. Ciatteo reported that: "In the last few days, Britton refused to shave, became negativistic and grossly unmanageable." He recommended transfer to the psychiatric division, Menard, Illinois.

On February 11, 1970, a Doctor Perez, psychiatrist, interviewed Britton and started medication. His comments contained the following:

"Conversation with the inmate reveals a type of thinking which is repetitive, verbigerative and inappropriate. Logic and judgment are rather poor. Emotionally he is inappropriate and has regressed to unreasonable degrees of hollering and talking loudly or repeating continuously that the Lord is his shepard [sic], and that he shall not want, etc."

On September 20, 1972, efforts were made to reduce his medication, and all was discontinued except Stelazine, 2 mg., which was maintained for a background stabilizing factor. Going below this amount of medication might be even more unfavorable, it was said.

The parole board was interested in an updated report concerning Mr. Britton. Doctor Perez briefly summarized Mr. Britton's situation and stated that he would discontinue all medication prior to the parole board appearance. He evaluated Mr. Britton as being in need of mental treatment: background of borderline intellectual and behavioral adaptation with a degree of regressive behavior which has been called immature, aggressive, and paranoid with prognosis highly doubtful.

On December 21, 1972, Dr. Perez reported the following concerning the discontinuance of his medication:

"Unfortunately, since that day the condition of the patient has progressively deteriorated. He downgrades nurses and attendants. He fears that people real and unreal are going to kill him. He talks loudly and without control throughout the night, disturbing the rest of the gallery population. For humanitarian reasons, I can no longer withhold medication from this patient."

On April 12, 1973, Dr. Perez reported that: "Britton has become somewhat more deteriorated in his schizophrenic decompensation since his parole was denied around the end of February of the current year."

On May 11, 1973, he reported that: "Britton appears very uncomfortable from an emotional point of view. He is inappropriate, very irritable, flies off the handle and threatens the staff."

A Max Givon, psychologist, in his progress notes of September 28, 1973, reported:

"John Britton continues to exhibit symptoms of instability and hostility. He is intellectually and emotionally a rather limited individual, who does not have the capacity to cope with even simple routines. For example, he repeatedly requests to be taken to the 'bullpen' for exercise, but then turns around and curses and threatens the officer in charge of the gallery. He presents a very problematic case from a treatment point of view. Thus far, he has defied our attempts to produce significant changes in his behavior."

On October 3, 1973, Dr. Perez prepared a report containing the following comments:

"Mr. Britton again was brought to my attention because he is creating disturbances in segregation every night for the past week. He has been segregated in the last cell of that unit. We should remember that when a schizophrenic of the degree of John Britton is isolated excessively, the only thing he has left is his world of fantasy and imagination."

A report dated May 23, 1974, from Dr. Perez, contained the following comments:

"Mr. Britton has been an extremely challenging and difficult patient to handle. Basically, when his limited resources are taxed, he reacts in such

irrational and persistently irritating manners that his handling becomes a complicated situation. I, as a psychiatrist, try to use any method in my profession through which I can relieve his difficulties. I use medicine, efforts to explain his limitations, and attempts to bring to the patient a minimum of reassurance and human concern which is what all persons, disturbed or not, crave. Unfortunately, a prison is a difficult environment. It is not always easy to bring reward to a patient who spends the night screaming or who reacts to everyday occurrences with immaturities. There is a problem of protecting other patients, the issue of security, which overlap and put under stress the facilities of this institution."

The psychiatric division review board met frequently to discuss Britton's case. Efforts were made to return Britton to the general population several times. It was said he usually became involved in a major confrontation with other residents and staff or he requested to be returned to a single cell, isolation-type condition. In all cases, the review board felt that Britton should remain at the psychiatric division to complete his sentence.

A summary of the nursing and medication records appeared next in the Department of Corrections report. In general it appears Mr. Britton had few physical problems. It was reported that he was a well developed young man in excellent health. The medication prescribed for him was directed at his mental and emotional problems. He received his first medication consisting of Pralizin, Artane, and Mellaril in February of 1970, and continued to receive medication throughout his incarceration with the exception of certain very brief periods. The following excerpts relating to nursing and medication were taken from the Department of Corrections report.

In a report dated July of 1973, a counselor named Andres reported:

"He was taken off medication during November, 1972, in an effort to determine if he could function without it. On December 25, 1972, he was extremely delusional, believing that his life was in danger and fearing that his cell floor was going to collapse at any moment. Medication was

reintroduced, and initially he stabilized quite quickly. Several days prior to his parole hearing, while on yard, he struck an officer for no apparent reason."

## The Department of Corrections report also contained the following comments:

"The nursing reports reflect that initially Britton was complaining about routine things such as rash he had last summer, upset stomach, minor chest pains and colds. On December 24, 1974, he started refusing to take medication prescribed. During the early part of 1973, Britton became restless and nervous. On June 7, 1973, a note reflects that the patient is getting worse every day about taking medication. The staff made three trips to his cell before he took it. He continued to be restless and nervous and started a fire in his cell on September 22, 1973. From this point on, it became a confrontation between Britton and staff personnel concerning medication. He would demand medication from the staff and then he would refuse to take it. The records reflect that Britton was up at various hours walking and pacing in his cell. He was becoming even more restless, nervous and unable to sleep. He started spitting on staff personnel and threatened to kill John Robertson on July 21, 1974, over his medication.

From July 21, 1974, to September 9, 1974, Britton was completely dependent upon medication to induce sleep. At times, he would request medication and then refuse to take it when staff personnel arrived. His condition was described as disturbed, restless, very disturbed, upset, cannot sleep and on September 9, 1974, Sergeant Sherbert reported the patient had been awake and bumping into his cell gate for several hours.

His medical progress report reflects that his general physical condition was good. There were no diseases or injuries recorded except for a fractured right little finger during childhood and a stab wound in the left lower lumbar area received in a fight in 1963. It was discovered that he had a hearing problem and a hearing aid was provided. He received chest x-rays regularly and all were negative. It appeared at times that Britton may be improving by his cooperation with the staff. At other times, he displayed a high degree of hostility and aggressiveness. On June 24, 1974, Britton was involved in a fight in the yard area. He was reported for swinging on an officer. The entry concerning medication on this date states that he takes oral medication and often pours it out. To reflect his changing moods, on August 22, 1974, Britton was reported as being very cooperative. On August 26, 1974, four days later, he assaulted his assigned counselor, Max Givon, by striking him several times about the face and knocked Officer Rader down causing injury to his head. Britton stated that we are trying to 'take his Soul', and refused to take oral medication. On September 5, 1974, an entry was made on his medical progress report that evaluates the effort. 'Patient refused shot yesterday. I spoke with Dr. Perez—This patient has been so ill lately—nothing seems to be helping him. Doctor has temporarily discontinued all medication. Will continue to observe.' "

The Department of Corrections reports also contained observations from various staff members which were said to provide additional insight into some of Mr. Britton's problems:

"It became obvious on December 8, 1965, that Britton had problems when he reported to Captain Handley that he was very nervous. Britton was observed shaking and trembling all over and perspiring heavily. On August 7, 1968, while at Menard, he attacked another resident from behind and struck him in the head with a cup. Action was initiated at that time to move Britton to a northern institution. Again, on August 7, 1968, he was removed from grade school for lack of interest and causing trouble in classes. Britton grabbed Officer McBride but released him. On August 15, 1968, Britton was placed in segregation because of two fights. Britton's explanation was because he disliked 'White folks.'

On July 8, 1969, Britton reported to Lieutenant Leithliter at Stateville that he was very nervous and did not want to eat with anyone. He was escorted to Detention Hospital. On December 30, 1969, Britton caused a disturbance in his cell. He stated, 'the Lord was there and that he was going to the Lord.' He asked for his Black brothers to accept and help him. Britton refused to accompany Lieutenant Harrelson to the Detention Hospital and necessary force was used to move him. On January 5, 1970, Britton caused another disturbance by hollering repeatedly out of his cell that, 'I am God, I am God, I have the Power'. A shot was ordered for Britton by Dr. Venckus and necessary force had to be used to administer the shot. Britton refused to take it. One Lieutenant was bitten under his left arm. From March 5 to April 8, 1970, Britton made some positive adjustments.

Britton was limited in what he could do and accomplish. If assigned to a particular detail, it was for a short period of time. On August 6, 1968, the School Principal at Menard stated that he had the wrong attitude and goals as far as school was concerned and felt that Britton would be better off on another assignment. He was considered as a food handler but was disqualified because of recurrent diarrhea. On December 28, 1967, he was returned to the school gang and assigned to the first grade level. This failed in a rather short period of time and Britton remained in Segregation for an extended period of time. The Assignment Committee reviewed his case regularly. On March 29, 1974, he refused to return to his cell and cursed other patients and threatened them for not giving him coffee. On May 6, 1974, the Assignment Committee released him from Segregation Unit. Britton requested that he be returned to Segregation on May 14, 1974, because he was unable to get along with others. On July 2, 1974, he was reported for fighting with another patient. On July 30, 1974, he was reported for numerous violations and abusing yard privileges. On August 27, 1974, Britton was reported for spitting on an officer and a visitor in the Psychiatric Center. His assignments were very limited because of his frequent acts of misconduct and his inability to adjust."

The Department of Corrections' report on Mr. Britton's conduct (other than the incidents recounted above) was rather general and in summary form. This format was apparently chosen due to the fact, as stated in the report, that he accumulated incident reports faster than they could be acted upon by the staff disciplinary committees.

Basically, it was reported that he became involved in confrontations on a daily basis with both residents and members of the staff. His actions, while confined, conformed in large part to the predictions of those who evaluated him. He was in constant trouble with loud talking, fighting and being at the wrong place without permission. He rebelled against institutional rules at every opportunity: smoking in class, refusing to work assigned jobs, roaming the galleries without permission, refusing to remove his cap at the barber shop, returning to his cell late, creating disturbances during sleeping hours, remaining in bed after he should have been up and at work, covering his cell lights with paper, and refusing to take his medication.

Several specific incidents during the last year of Britton's life were documented and should be noted as they are particularly relevant to this claim. On September 22, 1973, approximately a year before he died, Britton started a fire in his cell. Less than a month later, he started another fire in his cell. On August 3, 1974, reports reflected that "He was so depressed he was banging his head into the bars and taking his fist and hitting himself in the face." It was further said, "He . . . raised hell all night screaming and kicking his bunk . . ." On August 21, 1974, he threatened to kill an officer. Five days later he assaulted a man. On September 4, 1974, he started another fire in his cell. On September 10, 1974,

five days before his death, he made his last appearance before the merit staff for his acts of misconduct. He called the members "mother-fucking honkies" and stated that he would kill them all if he had a chance.

Because of his conduct record, Mr. Britton served a large portion of his time in the segregation unit. The report stated as follows:

"From December 12, 1972, until his death in September, 1974, Britton's activity with the general population was very limited. On December 23, 1972, he obtained general population status and was returned to segregation on December 25. He obtained general population status again on May 7, 1974; it lasted seven days, until May 14. Britton remained in the Segregation Unit from May 14, 1974, until September, 1974. His case was reviewed by a committee of staff personnel monthly. He remained there under close supervision and control because of his aggressive and hostile acts of misconduct toward other patients and staff personnel."

Mr. Britton was confined in the segregation section of the prison when he died. Illustrations and pictures of the cell and gallery were appended to the Department of Corrections report. There are 54 cells on the gallery and on September 15, 1974, only 18 residents were housed there, one per cell. No resident was out of his cell or in a position to observe the decedent at any time. All of the cells are fairly identical. Each is 11 feet deep, 4 feet, 7 inches wide and 9 feet, 2 inches high. After lockup at approximately 5:30 p.m., all cells were placed on deadlock and the keys were secured in a locker at the end of the gallery. Three cells, however, were different. They were apparently designed for individuals considered to be suicide risks. Their locks were disconnected from the master control lock and they cannot be placed on deadlock. These cells could be opened with keys at all times. Although it appears that at least one of these cells was unoccupied and available for use, Mr. Britton was not housed in one of these cells. The stated reason was that he was not considered by the staff to be

suicidal. Mr. Britton was housed at the end of the gallery away from the entrance.

The immediate circumstances surrounding the death of Mr. Britton are summarized from the Department of Corrections report and the transcript of the coroner's inquest which was offered by the Claimant.

The post-instruction for the 3:00 p.m. to 11:00 p.m. shift on the gallery in which Britton was housed provided for a gallery officer to make a round to check each resident every half hour. Due to extraordinary rowdiness of the residents on the night of Britton's death, the shift commander, Lieutenant Sam Grecco, ordered rounds to be made at 15-minute intervals. At approximately 7:20 p.m., Officer Arnold Brueggman, while making his round, discovered Britton hanging by his belt from a light fixture above the commode in his cell.

Immediately upon finding Britton, Officer Brueggman ran the length of the gallery, approximately 100 yards, to get keys and assistance. The report suggests that yelling for help at that point would have been futile as the concrete and steel structure operated as a barrier to sound. He obtained assistance from Lieutenant Grecco and Officer Virgil Voges. Officer Voges obtained keys and went and opened the grill work to the master locking system. He turned the master lock to a point where the cell could be opened with a key. During this time, Lieutenant Grecco called for more assistance. The three then went directly to Britton's cell, entered, and, with the two officers holding the body, Lieutenant Grecco cut him down. They removed the belt and a certified technician who was already on the scene gave emergency medical treatment, including oxygen, to no avail. Various other people then came and a Dr. James

M. Whittenberg pronounced Britton dead around 8:15 p.m. shortly after his arrival.

The leading case in Illinois on the standard of care for the health and life owed an inmate is *Desort v. Village of Hinsdale* (1976), 35 Ill. App. 3d 703, 342 N.E.2d 468. Therein it was held that "ordinary and reasonable care for the preservation of the prisoner's health and life under the circumstances of the particular case" must be exercised. (*Supra.*) Whether or not defendants have failed to act in accordance with this standard is a question for the trier of fact. The other cases cited by the parties follow the rule in *Desort* and the decisions turned on distinguishable facts. The facts in this claim set forth hereinabove consist solely of the Department of Corrections report and the coroner's inquest transcript and constitute the entire record on the issue of due care.

In the Claimant's complaint eight separate breaches of duty were alleged, one or more of which were said to have proximately caused the Claimant's decedent's death. First, it was contended that the Respondent negligently failed to maintain proper supervision of Britton's quarters. The record does not bear this out. The only evidence on this point was that on the night of Britton's death, a jailer was ordered to make an observation round once every 15 minutes instead of the usual once every half hour. There is nothing to indicate this was not done. Other than constant or continuous supervision, it is nearly impossible to envision what more could have been done, and under the facts of this case, we do not think the Respondent can be held accountable for not having supervised any more than it did.

Second, it was alleged that the Respondent negligently permitted Britton to possess a belt when it was known or should have been known that he was mentally of an unstable nature or condition and possessed suicidal tendencies. There is nothing in the record to suggest that mentally unstable persons should not be allowed to have belts. No violation of a rule or regulation concerning possession of belts was alleged or known. Under the facts of this case, we do not think the Respondent knew or should have known that Britton was suicidal. Nothing in the record indicates that the Respondent knew Britton was suicidal. No expert testimony was elicited to show that the symptoms exhibited by Britton should have indicated to the Respondent that he was suicidal. Moreover, we are unable to conclude from the facts ourselves that the Respondent should have known Britton was suicidal. He had been incarcerated for many years off and on, having served approximately seven years in succession at the time of his death. During this time the record does not disclose any single incident or combination of incidents which we can find should have been sufficient to put the various prison officials and staff on notice that Britton was suicidal. There is nothing to indicate that during all this time he did not possess, or have access to, a belt, a shirt, pants, a sheet or other instruments with which he could have hung himself. Setting the contents of his cell on fire can be attributed to any number of motives. Hallucinations or rantings and ravings about a supreme being are similarly susceptible to many explanations. One incident involving banging his head on cell bars, and punching himself in the face was reported to have occurred a little more than five weeks before his death. However, the report indicates by far that most of

Britton's acts of hostility and belligerence were directed toward the prison staff and other inmates. Britton definitely had and caused many problems, but we do not think the record shows by the preponderance of the evidence that the Respondent did know or should have known he had suicidal tendencies.

The third allegation of breach of duty was that the Respondent negligently failed to institute emergency procedures within the psychiatric division of Menard Penitentiary to enable a prompt response to aid an injured inmate and the fourth alleged breach of duty was that the Respondent did in fact fail to promptly respond to the aid of the decedent once apprised of his condition. As for the third allegation, the record is silent as to what standard emergency procedure was used at the time of Britton's death and no evidence of how it could have been improved was offered. We are persuaded that the staff at Menard did all it could to promptly react to the situation at hand. On this subject the record shows the following series of events occurred. At 7:20 p.m. Officer Brueggman observed Britton hanging from a light fixture in his cell. He immediately ran in excess of 277 feet to a point where he obtained the assistance of Lieutenant Grecco and Officer Voges. Officer Voges picked up keys from a key box located there and went over to a grilled gate that provided access to the master locking system. The door was opened and the lock handle rotated from deadlock position to key position to enable Britton's cell to be unlocked by key. The three then opened Britton's cell with the key and proceeded inside. Lieutenant Grecco climbed on top of the lavatory and cut him down while the other two officers held Britton up to keep him from falling. He was then placed on the floor of his cell.

Testimony indicated four or five minutes lapsed between discovery of the hanging and the cutting down. They then removed the belt from around the neck. By that time, or almost immediately thereafter, an emergency medical technician was on the scene and tried to revive Britton with a manual resuscitator bag. No vital signs were present and resuscitation proved to be of no avail. A Dr. Whittenberg arrived at approximately 8:15 p.m. and pronounced Britton dead.

The fifth allegation of breach of duty was that the Respondent negligently confined Britton in defectively designed quarters which were constructed in such a way as to allow him to hang himself. We do not think the evidence shows the cell was defectively designed. On Britton's cellblock there were two unoccupied "suicide cells" but he was not placed in one because he was not thought to have suicidal tendencies and, as previously stated, we do not think the Respondent negligent in not knowing he was suicidal. We think that his cell was adequately designed for the purpose intended. His death was the proximate result of his own intentional act and not the result of defectively designed quarters.

The sixth allegation of breach of duty was that the Respondent negligently provided improper and inadequate medical attention to the decedent prior to and/or after he hung himself. Claimant offered no expert testimony or any other evidence to prove this allegation. The same is true with respect to the seventh allegation of negligence, that the Respondent provided improper and inadequate psychiatric care and treatment during Britton's incarceration prior to his death. These are essentially allegations of medical malpractice and as such must be proven by expert testimony. *O'Donnell v. State* (1980), 34 Ill. Ct. Cl. 12; *Porter v. State* (1965), 25 Ill. Ct. Cl. 62.

The last alleged negligent act or omission was that the Respondent maintained an improper and inadequate rehabilitative environment all during the confinement of the decedent and/or immediately prior to his death. The Respondent failed to object to this allegation. There is nothing in the record from which we can conclude that the rehabilitative environment was improper and, assuming *arguendo* that it was improper, there is no evidence that such was the proximate cause of Britton's committing suicide.

In summary we find that the record shows that the Respondent exercised ordinary and reasonable care for the preservation of the inmate's health and life under the circumstances of this case. In fact, it shows that a great deal of effort was made by the Respondent to treat Britton's mental problems. While Britton's death was unfortunate, we do not think it was foreseeable and the evidence is insufficient for us to make an award.

Claim denied.