(No. 86-CC-0254—

LUTEE SHERROD, as Special Administratrix of the Estate of JOYCE PACKER, Deceased, and as Guardian of the Estate of ROCHELLE JOY PACKER, a minor, and CHANELLE JOY PACKER, a minor, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 6, 1997.*
*Order filed August 28, 1997.*

MARVIN A. BRUSTIN (MARK S. SCHWARTZ, of counsel), for Claimant.

JAMES E. RYAN, Attorney General (JOHN R. BUCKLEY, Assistant Attorney General, of counsel), for Respondent.

## OPINION

FREDERICK, J.

Claimant filed her second amended complaint sounding in negligence on July 17, 1987. Claimant seeks $100,000 in damages for the alleged negligence of the Respondent in failing to admit Claimant's decedent to the Illinois State Psychiatric Institute at 1601 W. Taylor Street, Chicago, Illinois.

### The Facts

On January 21, 1982, shortly after midnight, the Chicago Police and Fire Departments were called to a fire at 1066 West 14th Street in Chicago, Illinois. Police Officer Marty Gavin, a trained arson investigator, investigated the incident and learned that Claimant's decedent, Joyce Packer, the occupant of apartment 303 at 1066 W. 14th Street, had died in the fire.

Joyce Packer was born on November 27, 1957. She was the stepsister of Johnny Sherrod, Jr., who was born on June 30, 1964; Yvette Sherrod, who was born on September 11, 1961; and Anthony Sherrod, who was born on February 17, 1971. Some years before, Joyce Packer provided care for Johnny B. Sherrod, Jr. while their mother, Claimant Lutee Sherrod, worked. Johnny Sherrod, Jr. and Joyce Packer enjoyed a close relationship. Joyce Packer went to church regularly and was valedictorian of her class at Dunbar High School. Joyce Packer was also the mother of two children, namely Chanelle Joy Packer, born January 15, 1979, and Rochelle Joy Packer, born August 5, 1981.

Joyce Packer had a history of mental problems. She had entered a religious cult after her freshman year in college. She was hospitalized at the Illinois State Psychiatric

Institute (hereafter referred to as "ISPI") a number of times thereafter, including several instances when she neglected to take her medication. In the years between 1979 and 1982, Joyce Packer was hospitalized at ISPI on five occasions. At the time of her death, Joyce Packer was employed by the United States Postal Service earning about $500 every two weeks.

The medical records indicate that Joyce Packer was initially hospitalized on November 15, 1979, suffering from religious delusions. On that occasion, she was admitted after an acute psychotic episode led her to attack someone at the post office where she worked. The Emergency Services Sheet from that admission indicates that Joyce Packer was suffering from hopelessness and suicidal ideations.

Joyce Packer was again hospitalized from December 10, 1979, through January 7, 1980, after force-feeding her child whom she believed to be possessed by the devil. The records indicate that the precipitating cause of this incident was a problem with a man in her life. The hospital records relate that she attacked her mother, Lutee Sherrod, with a knife on December 10, 1979, because she believed that Mrs. Sherrod was possessed by the devil.

During Joyce Packer's hospitalization of December, 1979, she was placed in full leather restraints on December 10, 11, 12, 14 and 15, 1979, for the protection of herself and others.

The next hospitalization occurred on January 13, 1980. At that time, Joyce Packer had been spitting on strangers. She spit on a stranger in the street who, in turn, struck her in the face. The record shows that this incident occurred after Joyce had failed to take her Lithium. During this hospitalization, Joyce was again placed in full leather restraints on January 14, 15, 16, 17 and 18, 1980. The

records of January 18, 1980, reveal that she was delusional about her medication being poisoned. The record of this hospitalization also shows that she threatened and struck a female staff member in the face. She also refused her medication on January 21, 1980.

The medical records from ISPI indicate that on September 23, 1980, Joyce Packer was brought into ISPI by the police after wandering the streets naked. On that occasion, she was hostile and angry as well as confused upon being brought into ISPI. At the time of her interview with a physician, she had calmed down, was cooperative, and her speech was not pressured. There was no thought disorder revealed and there were no hallucinations, and no suicidal or homicidal ideations noted. The cause for this situation was believed to be the refusal of Joyce Packer to maintain Lithium and, once again, her involvement with a man.

On September 24, 1980, she was placed in full leather restraints for the protection of herself and others.

On August 7, 1981, Joyce Packer was again hospitalized at ISPI. At this hospitalization, she had delusions that she had given birth to two children. Once again, her speech was not pressured, she denied any suicidal ideation, and denied any homicidal ideation. The record showed that she was oriented times three, which means she was oriented as to her identity, the time and the place. Upon admission, she was striking patients and staff members and was again placed in full leather restraints on August 8 and 9, 1981, after attacking a staff member and stabbing a patient with a fork. She had stopped taking her medication two months prior to this hospitalization. In relation to the pending claim, Joyce Packer was brought to ISPI on January 20, 1982, one day before the fire at her home which claimed her life.

On the day before Joyce Packer's death at approximately 10:00 p.m., the Sherrods received a telephone call from the parents of Joyce Packer's boyfriend, Michael Stewart. The Stewarts lived at 116th and Aberdeen, and Mr. Stewart advised Lutee Sherrod that Joyce Packer had walked from the post office to the Stewarts' home.

Johnny Sherrod, Sr. requested that his son, Johnny Sherrod, Jr., go with him to get Joyce at the Stewarts' home. When Johnny and Johnny, Jr. went into the house, Joyce was sitting in the kitchen or dining room wearing a long, thin, linen dress and a light summer jacket. The bottom of her dress was wet and Joyce was saying that she wanted to go home and see her children. At the time, the children were at the Sherrods' house at 1212 W. Washburne. Although it was a cold day and there was snow on the ground, Joyce would not put on dry clothes. Johnny Sr. kept asking her about her medication because Joyce did not have her purse. At that time, Joyce lived at 1066 W. 15th Place, but her children lived with the Sherrods.

Johnny Sr., Johnny Jr. and Joyce Packer then got into Mr. Sherrod's vehicle. Mr. Sherrod took I-57 to the Dan Ryan Expressway and exited at Roosevelt Road, proceeding westbound on Roosevelt. As he got to Throop Street, Joyce Packer grabbed the wheel and tried to make the car turn left towards the house where the children were staying. When Johnny Jr. grabbed her arms, Joyce bit him. In the meantime, Johnny Sr. was able to gain control of the car and pull it over to the side of the road. Mr. Sherrod and his son restrained Joyce Packer and Johnny Jr. moved into the front seat and held her until they got to ISPI. Both men continued to restrain her as they drove to the hospital, and although Joyce continued to struggle for a while, she finally stopped. At the time that Joyce turned the wheel of the car, the Sherrod vehicle went into the

oncoming lanes of traffic. Johnny Sr. and Johnny Jr. continued to hold Joyce's arms at the hospital until the doctor came and talked to Mr. Sherrod.

She was treated by Dr. Leoneen Woodard. Dr. Woodard has no independent recollection of having seen Joyce Packer on this occasion.

Dr. Woodard, a first-year resident, testified that, while she did not recall this patient, Joyce Packer was noted to have been taking Lithium Carbonate four times a day. Dr. Woodard was told that Joyce Packer had walked with light clothes on for four miles and that she did not have her medication with her. In addition, Johnny Sherrod, Jr. testified that Joyce told the doctor that she was not taking her medicine. Joyce Packer was oriented times three at the time of presentation at ISPI. Dr. Woodard acknowledged that Joyce was dressed too lightly for the weather. The doctor also testified she had the authority, pursuant to the existing ISPI procedures, to hospitalize Joyce Packer involuntarily in the event she was determined to be immediately in danger of harming herself or others or was unable to take care of her daily needs.

Dr. Woodard noted in the record that the patient suffered for a manic bipolar disorder consisting of mood swings with high episodes and depressive episodes; however, Dr. Woodard did not know how those mood swings would manifest themselves.

Dr. Woodard had no information about Joyce Packer's prior psychological history nor did she know where she had obtained the information noted in the patient's chart in 1982.

The ISPI admissions procedures provided that to make a history of previous patient contact at ISPI more available to O.D.'s, a supplementary patient contact file

was available in the O.P.D. Records Room 129, with material to be held for two years. The file consisted of admissions notes, telephone intake write-ups, discharge summaries, and similar material filed alphabetically by the patient's last name. No materials were to be retained by the interviewer or sent to a unit. They were to be returned after use to the clinic manager's office for refiling.

Although the records for a period of two years of Joyce Packer's prior hospitalizations were available to Dr. Woodard, Dr. Woodard could not recall ever reviewing any of Joyce Packer's records.

Dr. Woodard testified that if she had been told that the patient walked a long distance in the cold without appropriate dress, she would have tried to gather more information. Johnny Sherrod, Jr., however, testified that his father told the doctor that Joyce had walked a long distance in light clothing and that she did not have her medication with her and that this information was confirmed by Joyce, who said she was not taking her medication. Dr. Woodard found that Joyce appeared to be under control and that the patient was not admitted. Dr. Woodard could not recall whether she had talked to Johnny Sherrod, Sr. regarding Joyce's Lithium intake.

Johnny Sherrod, Jr. testified that although he was not sure if his father told the doctor about the incident in the car, Mr. Sherrod did tell the doctor at ISPI that Joyce had walked a long distance with light clothing on and she didn't have her medication with her. Johnny Sherrod, Jr. also testified that Joyce told the doctor she wasn't taking her medicine. Johnny Sr. was asking that his daughter be admitted to the hospital and asking why they did not admit her. Mr. Sherrod was saying that it wasn't normal to walk 100 blocks in the cold in light clothing. The doctor said that Joyce appeared to be under control and she was not admitted to the hospital.

Dr. Woodard did not note in her intake report the patient's history of refusing to take medication. Although Joyce Packer was under the care of a Dr. Goodnick at the Affective Disorder Clinic, she did not consult with Dr. Goodnick. While the records indicate that a Dr. Powers had talked to the patient on January 20, 1982, Dr. Woodard did not recall if Dr. Powers, her supervisor and a third-year resident, ever saw the patient. It was the procedure at ISPI to consult with one's supervisor in situations such as this. As supervisors did not generally do separate intake evaluations, it is possible that information was relayed to Dr. Powers by members of the patient's family and that such information was not noted in the record.

The records reflect that Joyce Packer indicated to Dr. Woodard that she had had a fight earlier that day with a boyfriend and that she was upset with him and had scratched him. Joyce Packer also told Dr. Woodard that she had called her stepfather after the fight and requested that he bring her to ISPI. Joyce Packer also mentioned an argument that she had with her stepfather on the way to the hospital and her anger at the fact that Johnny Sherrod would not stop at home to let her visit her children.

Dr. Woodard testified that the records did not reflect that a Lithium check was done on the patient on January 20, 1982. It was not the practice at ISPI to do blood work at night as the laboratory facilities were not available and no trained personnel were on hand to do the blood work. If night-time blood work was necessary, the procedure was to transfer the patient to the University of Illinois Hospital where blood work could be done.

On January 21, 1982, Officer Marty Gavin was called to Joyce Packer's apartment at 1066 W. 14th Street, Apt. 303, Chicago, Illinois. His investigation, which occurred

within 24 hours of Joyce Packer's release from ISPI on January 20, 1982, revealed that there were three points of origin of the fatal fire. The fire had been set by hand. A hand-held match and a lit piece of paper had been used to light various pieces of material within the apartment. Officer Gavin excluded any electrical or gas problems having accounted for ignition. He noted the three points of origin of the fire, all of which were located within Joyce Packer's apartment.

One point of origin was on the third floor, at the north wall of the living room. A "V" pattern extended the length of the wall pointing to the source of the fire. A pile of combustibles at that location was the originating source of the fire. He found that a heavy concentration of plastics and clothing at that location had been ignited.

The second point of origin was on the fourth floor at the west wall of the bedroom. He noted that a flaming rag had been stuffed into the cushion of the love seat and that a fire started there went from the sofa cushions to an adjacent bed and started the bed on fire.

The third point of origin of the fire was at the west wall of the hallway outside of the fourth floor bedroom. The wall had been lined and cluttered with clothing and newspapers which had been ignited by a hand-held match or lit piece of paper. The door to Joyce Packer's apartment had been locked from the inside necessitating a forced entry and no one was seen leaving the apartment. Based upon his years of experience as an arson investigator, Officer Gavin opined that Joyce Packer was the only person in the apartment at the time of the fire and it was his belief that Joyce Packer started the fire.

Claimant, individually and as administrator of the estate of Joyce Packer, deceased, argues that the Respondent,

State of Illinois, was negligent for failing to involuntarily admit Joyce Packer on January 20, 1982, to ISPI, and that the failure to admit her constituted negligence and proximately resulted in the death of Joyce Packer.

In support of Claimant's contention, the Claimant introduced the testimony of Dr. Leonard Elkun. Dr. Elkun is a psychiatrist who has been licensed since 1967. He is not board-certified. He did his residency in psychiatry at the University of Chicago Hospitals from 1967 to 1970 and was a graduate of the Chicago Institute of Psychoanalysis, which he attended from 1970 to 1976.

Dr. Elkun reviewed Joyce Packer's medical records from five hospitalizations between 1978 and 1981, the post-mortem, the record of the emergency room visit of January 20, 1982, and the police report. Dr. Elkun testified that the Illinois State Psychiatric Institute had a duty to provide reasonable care in accordance with the standard of care in the community. He further testified that ISPI holds itself out as a facility that provides psychiatric care to patients in the community. Dr. Elkun was familiar with the ISPI in that he worked there for six months and helped to establish a patient program for the treatment of persons suffering from schizophrenia.

Dr. Elkun gave his opinion that ISPI was negligent in its treatment of Joyce Packer. He opined that the doctors at ISPI failed to diagnose an acute psychotic episode. He further opined that the doctors at ISPI failed to take a serum Lithium level at the time of Joyce Packer's presentation at the emergency room to determine if the level of Lithium was within a therapeutic range. If a diminished level of Lithium was found, ISPI could have instituted measures to reverse the process.

Dr. Elkun is of the further opinion that the State of Illinois and ISPI failed to treat Joyce Packer adequately by failing to hospitalize her. The physicians or residents on duty at ISPI failed to consult with other psychiatrists or residents who knew more about the condition of Joyce Packer at the time she was brought to the emergency room on January 20, 1982. He testified that any symptomatology on the part of Joyce Packer could have resulted from a drop of her Lithium level, even within an accepted range, and that drop could be enough to precipitate symptoms of mental illness or disease. Any symptomatology indicates a necessity for some immediate evaluation, particularly where a patient has a history of not taking medication on a regular basis.

Joyce Packer had a history of treatment at ISPI. The history and the records disclosed that she stopped taking Lithium Carbonate just prior to her hospitalization in August, 1981, and that she had suffered an acute psychotic state after failing to take her medication in 1980. Once in a psychotic state, a patient can have hallucinations, delusional thoughts, and an inability to test reality, or know the difference between what is going on inside and outside of one's body.

The police report viewed by Dr. Elkun indicated that just prior to her hospitalization, Joyce Packer was hearing curses from the devil and was in an extremely agitated state. However, Claimant concedes that there is no evidence that the Respondent was made aware of that incident at the time Joyce Packer was brought to the hospital emergency room on January 20, 1982.

Dr. Elkun's opinion was that given her medical history, and the fact that on the same day that Joyce Packer had taken an extremely long walk while inappropriately dressed, physicians at ISPI failed to recognize her disintegrating condition. Joyce Packer was being treated by Dr.

Goodnick at the Affective Disorder Clinic, yet Dr. Good-nick was never consulted. As the treating physician of Joyce Packer, this doctor would have been in a better position than a stranger in the emergency room to evaluate the subtleties, mood or cognitive functioning as they pertained to Joyce Packer. Dr. Elkun testified that a consultation with a patient's psychiatrist is critical and essential in such a situation, especially where the patient's condition has deteriorated to the point where it required hospitalization five times in a three-year period.

Dr. Elkun felt that, although Joyce Packer denied suicidal thoughts at the time of her hospital visit on January 20, 1982, sometimes this status is not well evaluated by simply asking the patient whether he or she is suicidal. The fact that this patient was suffering from an acute psychotic episode was evidenced by her dressing too lightly for the weather and the similarities to the symptomatology exhibited during her prior hospitalizations.

Dr. Elkun believed that even if the physicians at the emergency room were not told of the complete symptomatology engaged in by the decedent within 24 hours of the visit to the emergency room, the emergency room physicians on duty could have asked questions to elicit this information. Dr. Elkun observed that the patient's activities of having walked over 100 blocks on a cold day in summer clothing was indicative of a self-destructive impulse that was out of control. The patient had lost control of these impulses in the car on the way to the hospital. Joyce had had a fight with her boyfriend earlier in the day and an argument with her stepfather on the way to the hospital. The hospital records reflect that on January 20, 1982, Joyce told Dr. Woodard that she had called her stepfather and requested that he bring her directly to the

hospital. She became upset with her stepfather because he would not let her first stop and visit her two children.

Dr. Woodard chose to refer the patient back to the Affective Disorders Clinic instead of involuntarily admitting her or sending her to the University of Illinois Hospital which could have immediately ascertained whether Joyce Packer's Lithium level was at a dangerously low level. Johnny Sherrod, Jr. could not specifically recall whether Joyce Packer's self-destructive behavior of turning the wheel of the car on the way to the hospital was ever conveyed to the doctor at ISPI. He did specifically recall, however, that Johnny Sherrod, Sr. was requesting that his daughter be admitted, that Joyce had walked for 100 blocks in the cold wearing light clothing without her medication, and that Joyce Packer told her doctor that she wasn't taking her medicine.

Finally, Dr. Elkun testified that

"Based upon a reasonable degree of medical and psychiatric certainty and my review of the medical records * * *, it is my opinion that had ISPI and its agents, the physicians that examined the patient on January 20, 1982, made the diagnosis of her disintegrating situation, psychological situation, secondly checked her serum Lithium level and in the event of finding deficiency in her level to have made some adjustment, thirdly to have consulted with a physician close to the patient over a period of time and fourthly, having made the diagnosis, having appreciated the urgency of the situation, and having failed to hospitalize her, those four factors, I believe, strongly and of the opinion contributed to Ms. Packer's death on January 21, 1982."

The Respondent points out that when John Sherrod and John Sherrod, Jr. brought Joyce Packer to ISPI, they were not restraining her and she was acting calm. Numerous notations about the patient's condition at the time of the examination were written on the intake evaluation form which was prepared at about 2:00 a.m. The intake evaluation form notes that Joyce Packer was "oriented times three," which indicates she knew who she was, where she was, and what time it was. Her speech was coherent and not pressured. There was also a notation made

that she did not appear suicidal and denied suicidal or homicidal ideation. She did not show any symptoms of a manic episode. Dr. Woodard also noted that Joyce Packer's eating and sleeping habits were normal. Joyce Packer told Dr. Woodard that she could work things out with her boyfriend and she felt comfortable returning home.

Dr. Woodard spoke with Johnny Sherrod at ISPI. Johnny Sherrod, Jr. did not speak with Dr. Woodard. Johnny Sherrod, Jr. claims that he could not hear the entire conversation. Joyce Packer was not admitted to ISPI that night but a deflection (referral to out-patient clinic) was made. Johnny Sherrod and Johnny Sherrod, Jr. then took Joyce Packer back to the Sherrod house. Once back at the house, no one stayed up to watch and take care of her that night. They did not know Joyce Packer left until the next morning. When Lutee Sherrod, Ms. Packer's mother, noticed Joyce had left, no one went to check on her at her apartment. Mrs. Lutee Sherrod did call Joyce Packer's apartment, but no one answered. Even then, none of the Sherrods went to check on Ms. Packer at her apartment.

Dr. Woodard testified that the most important information a doctor uses in making an assessment of the patient for commitment is the appearance and condition of the patient at the time of examination. It was noted in the intake evaluation that Joyce Packer was taking her medication. Dr. Woodard was told that Joyce Packer's eating and sleeping habits were normal. These signs are key indicators used to diagnose a manic episode. When being interviewed, Joyce Packer was speaking calmly and coherently and her speech was not pressured. Dr. Woodard asked Joyce Packer if she had any suicidal or homicidal ideation. Dr. Woodard noted that Joyce Packer was dressed neatly. The doctor did make a provisional diagnosis of a bipolar

disorder-mania. However, at the time of the examination, there was no evidence of thought disorder, nor of manic episode. Additionally, Joyce Packer was examined by Dr. Woodard's supervisor, Dr. Power, according to hospital procedure.

According to Dr. Woodard, in order to involuntarily commit someone to an institution, it must be found that the individual is an immediate threat to herself or another or unable to take care of her daily needs. Dr. Woodard did not believe that Joyce was an immediate threat in her clinical judgment. Joyce Packer did not exhibit the symptoms required to be committed. The only way she could be committed was if she were assessed as being an immediate threat to herself or to others, or if she was unable to care for her daily needs. Dr. Woodard felt that she was able to care for herself, as her eating and sleeping patterns were normal. She denied suicidal or homicidal ideation, and she was dressed neatly. It was noted that she was taking her medication. Dr. Woodard stated that one of the most important factors in deciding whether to involuntarily commit an individual is their presentation at the time of the treatment and the examination revealed that Joyce Packer did not need to be hospitalized.

Dr. Woodard determined that in her professional judgment there was no evidence of manic episode. Dr. Woodard followed established procedure and applied the proper level of professional skill and care and thus did not breach any duty of care to Ms. Packer.

Dr. Woodard determined that Joyce Packer did not require a blood test for Lithium levels. Dr. Elkun stated that when the Lithium level is acceptable in a patient, that individual will be able to function, act normally, and be coherent and cogent in a conversation. At the time of the evaluation by Dr. Woodard, Joyce Packer exhibited all

of these characteristics. The intake evaluation states that Joyce Packer was cooperative. Her speech was coherent and understandable. Her speech was not pressured and she was calm. In Dr. Woodard's opinion, as the treating physician at the time of the evaluation, there was no reason to do a serum Lithium check. There was no sign of pressured speech, thought disorder, mania, sleep deprivation, or loss of appetite. As a result of these factors, established at the time of the evaluation, Dr. Woodard indicated that the Lithium level test was not warranted.

The Claimant's expert witness, Dr. Elkun, testified that Joyce Packer should have been involuntarily committed. The facts show that Joyce Packer did not exhibit the characteristics necessary to be involuntarily committed. Those characteristics are: the patient must be assessed as an immediate and imminent threat to herself or to others; or she must be unable to care for her daily needs. A subjective evaluation of the patient, done by Dr. Woodard, revealed that her condition was not "disintegrating" or "suicidal." It shows to the contrary that she was calm, coherent and comfortable with going home. She showed no evidence of thought disorder. In Dr. Woodard's opinion, the scope and depth of the conditions present at the time did not require hospitalization.

## The Law

The burden of proof in a negligence case is on the Claimant and the Claimant must prove by a preponderance of the evidence that the State was negligent and that such negligence was the proximate cause of Claimant's damage. *Hoekstra v. State* (1985), 38 Ill. Ct. Cl. 156.

Claimant's claim in this cause is a claim of inadequate and improper psychiatric treatment and care for the failure of the State to admit Claimant's decedent to ISPI.

These are allegations of medical malpractice and must be proven by expert testimony. (*Woods v. State* (1985), 38 Ill. Ct. Cl. 9.) In *Woods, supra,* the Court found that the State was not liable because there was nothing in the record to show the Respondent knew or should have known that the patient was suicidal. There was no expert testimony elicited to show that the symptoms exhibited by the patient should have indicated to the Respondent that the patient was suicidal. Because of this lack of proof, the Court found that the decedent's committing suicide was not foreseeable and denied the claim.

In this case, there is no proof before the Court that the State knew or should have known that Joyce Packer was suicidal. There is nothing in the testimony of Claimant's expert which indicates the symptoms displayed by Joyce Packer should have put the State on notice that she was suicidal and would commit suicide within 24 hours.

This Court also denied liability in a mental patient suicide case where the claim was based on the death of a mental patient by suicide subsequent to his escape from a mental health center. The Court held that to prevail, the Claimant must prove there was a lack of proper and reasonable care and that the State knew or should have reasonably been expected to know of or predict the escape. Because there was no proof that the Respondent knew or should have known the individual was contemplating escape or a suicide attempt, the claim was denied. *Calvin v. State* (1982), 35 Ill. Ct. Cl. 611; *Gaiser v. State* (1993), 45 Ill. Ct. Cl. 10.

The State is not an insurer of the safety of patients under the care of the Department of Mental Health but it owes patients a duty of protection and must exercise reasonable care towards such patients according to their

known condition or the condition, which through reasonable care, ought to be known. In *Reynolds v. State* (1983), 35 Ill. Ct. Cl. 647, the Court denied liability in a mental patient suicide case where Claimant failed to prove a negligent act committed by the State and where Claimant failed to prove a causative factor between any alleged negligence and the subsequent death by suicide of Ms. Reynolds. See also *Stevens v. State* (1976), 31 Ill. Ct. Cl. 458.

In a medical malpractice claim, the Claimant must prove by a preponderance of the evidence that there was a breach of a duty, the Respondent's deviation from the standard of care, and that the deviation was a proximate cause of the Claimant's injury. The standard of care is that care which is provided by reasonably well-trained medical providers in the same circumstances in a similar locality. *Williams v. State* (1994), 46 Ill. Ct. Cl. 221.

In this case, the evidence shows conclusively that the Respondent had no reason to believe that the decedent had self-destructive thoughts. The State is not the insurer of mental health patients. In *Ingram v. State* (1979), 33 Ill. Ct. Cl. 134, the Court denied liability where a patient admitted to ISPI committed suicide. The decedent was admitted and later hung himself in the facility. The Court found, based on the evidence and medical records, that there was not sufficient evidence offered to show that the State should have known that the decedent had self-destructive thoughts.

The Claimant has the burden of showing that the Respondent failed to exercise reasonable care for the patient given her known condition. The Claimant has failed to meet that burden. (*Gaiser v. State* (1993), 45 Ill. Ct. Cl. 10.) While the death of Joyce Packer was a tragedy, we are constrained by the law and the facts of the case to deny this claim.

For the foregoing reasons, it is the order of the Court that Claimant's claim be and hereby is denied.

## ORDER

FREDERICK, J.

This cause has come before the Court on Claimant's motion for rehearing, and the Court having reviewed the testimony, pleadings, the entire court file, and the argument of counsel, and the Court being fully advised in the premises,

Wherefore, the Court finds:

1. That Claimant's counsel has done an admirable job of advocating Claimant's position.

2. That the Court believes its opinion is based on the law and the evidence.

3. That Dr. Elkun's opinions are not as clear as argued by Claimant and are cited in the Court's opinion.

4. That Claimant has failed to meet Claimant's burden of proof.

Therefore, it is ordered that Claimant's motion for rehearing is denied.