(No. 76-CC-1942-)

MILLERNESE CALVIN, Administrator of the Estate of Christopher Calvin, Deceased, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Order on motion to strike filed September 21, 1976.*

*Opinion filed March 1, 1982.*

*Order on petition for extension of time filed April 29, 1982.*

*Order on motion to close record filed August 19, 1982.*

HARVEY L. WALNER & ASSOCIATES, LTD., for Claimant.

TYRONE C. FAHNER, Attorney General (JOHN R. FANONE, Assistant Attorney General, of counsel), for Respondent.

## ORDER ON MOTION TO STRIKE

PERLIN, J.

This matter coming on to be heard upon the motion of Respondent to strike from the complaint Dr. Jack Saporta, superintendent of Tinley Park Mental Health Center, and to strike the *ad damnum* as it exceeds the statutory limit, the Court being fully advised in the premises, and, having given due consideration to the allegations of said complaint, and to said motion,

It is hereby ordered that said Dr. Jack Saporta, superintendent of Tinley Park Mental Health Center, be stricken as Respondent.

It is further ordered that the *ad damnum* of $1,000,000 be stricken as it exceeds the statutory limit.

## OPINION

HOLDERMAN, J.

This matter is before the Court upon a motion by Respondent to dismiss this cause and Claimant's objection to said motion.

This action was brought by Millernese Calvin, administrator of the estate of Christopher Calvin, her deceased son.

Christopher Calvin was 22 years of age with a long history of mental illness. At the time of his death, he was a patient at Tinley Park Mental Health Center.

The deceased graduated from grammar school in 1965, graduated from Harper High School in 1969 where he was an all-city basketball player, and attended the University of Illinois beginning in 1969. He played basketball for a short time on the freshman team but became ineligible due to poor grades. He later enrolled at Robert Morris Junior College, played basketball there, and graduated. He then enrolled at Northwestern University on a partial scholarship in 1972 and played only two games for the team. He dropped out of Northwestern University, re-enrolled in the fall of 1973 but was not able to function normally, and again dropped out.

The only work the deceased did was part-time or summer jobs and made no more than $100 per month at any one of them.

In 1973, he was treated for his problems at Jackson Park Hospital and later at the Tinley Park Mental Health Center. In May of 1974, he had an emotional breakdown and returned to Tinley Park for several weeks. In the latter part of 1974, he talked to his mother about being put out of his misery and told of hearing voices which told him to kill himself. He became more and more agitated,

angry and nervous, and returned to Tinley Park in April of 1975. During this time, he allegedly told his mother he had gone to the nearby tracks and laid his head down. He also told her that he had been placed in restraints prior to a home visit in late May. While home on this visit, he wanted to return to Tinley Park because he was afraid. In his mother's home and while she was present, he went into the bathroom where he was found with his left wrist bleeding. He was treated at Jackson Park Hospital and returned to Tinley Park on June 1.

The Tinley Park Mental Health Center is a State mental hospital consisting of approximately 500 acres.

The deceased was described as being a big, fast person, weighing from 195 to 210 pounds.

The record discloses that when he was agitated, he became restless, would talk louder and his voice would rise. He would pace the floor. When he was calm, he was polite and spoke pleasantly.

On his last visit home, shortly before his death, the deceased acted calm, was low-voiced and quiet. In that condition, he was returned to Tinley Park.

While he was at Tinley Park, the deceased was in a confined area and could not leave without permission and the doors to the area were opened and closed only with a key in the hands of authorized personnel.

On the day he met his death, the deceased was in the confined area and could not leave without supervision. He asked permission to leave the area but was refused. When he talked to the individual in charge of the desk, he was calm and quiet. He then went and sat down without any unusual actions or activity on his part. The area where he was sitting was the T.V. area and was a comparatively short distance from the exit door.

When Mrs. Munson, an attendant at the hospital, was leaving, he bolted through the door, brushing her aside. She went to look for him but he was already gone. She immediately returned to the unit and informed a Mrs. Simpson, who called security. Mrs. Munson heard Mrs. Simpson tell security that he was suicidal and make some reference to the tracks.

The incident occurred at approximately 5:40 p.m., and at 6:05 p.m., the mental center was informed of his death, as he had been found on the tracks. Approximately 25 minutes had elapsed from the time of his escape until the report of his death. In the interim, security had been searching for him.

Claimant alleges that Respondent was guilty of the following acts of negligence: (1) it failed to provide proper medical care; (2) it failed to provide proper supervisory control; and (3) it failed to provide proper and trained security guards.

Dr. Joseph Bongiorno testified for Claimant. He specializes in psychiatry and is on staff with Michael Reese Hospital and is also in private practice. It was his opinion that the treatment of the deceased was inadequate, that he should have been confined to an individual room under lock and key, and a staff member should have been available to soothe him. Because this was not done, he was of the opinion that the restraint, therefore, was deficient. He stated additional medication was needed and if enough had been given from the onset, his condition would have improved. He also disagreed with the medical center's policy of allowing the patient to go to his home at intervals. He testified that no real measure is available to prevent a suicide short of restraint, and that a patient might require restraining regardless of the law regulating the use of such restraints.

Members of the hospital staff testified that before restraints were used, a patient would have to exhibit some evidence of needing restraints by either being agitated, fighting, by throwing chairs, or some similar activity. It was their testimony that none of these acts occurred on the day the patient died. The last time the patient had been in restraints was because he had been screaming and twisting and asking for restraints.

One of the staff from the hospital testified that the criteria for using restraints was whether the patient was so uncontrollable that he might hurt himself or others, and even though a patient requested restraints, a doctor's order was still required. She further testified that on the day he met his death, he did not ask for restraints as he had done on previous occasions and he exhibited no characteristics requiring restraints.

Dr. Zita Lezeau, a physician at Tinley Park Mental Center, testified that she was the doctor in charge of decedent's ward. She testified that he had been placed in restraints on May 20 and May 24. She stated she was treating him for deep depression but was not overlooking his schizophrenia, and that he had never been off the ward without an escort. She also stated he had been receiving Navane, and after he refused to take it, she administered an injection of Thorazine. She testified that patients have to be treated as individuals and that medicine is prescribed based upon their history and symptoms, and that restraints are used only as a last resort and then only to prevent hurt or damage to the person or to others. She stated she had never seen him in a condition that required restraints, and there was no indication he needed restraints when he returned from his last home visit.

Dr. John Davis, employed by the Illinois State Psychiatric Institute in Chicago, testified on behalf of Re-

spondent. He had no interest in the outcome of this case and received no fee or compensation to appear at the trial.

Dr. Joseph Bongiorno, the psychiatrist who testified on behalf of Claimant, stated he was hired by Claimant and was being paid for his appearance and his testimony.

Dr. Davis had a long history of education in the psychiatric field and has held several positions of importance dealing with the treatment of mental disorders. Among them, he has been consultant to 12 different groups, including the Food and Drug Administration, the A.M.A., and the National Academy of Science; he has served on the editorial board of eight journals, has won several awards, has membership in 19 societies, and has written five books in the area of psychiatric disorders and disease. Most important to the case at hand, he has written a paper entitled, "Comparative Doses and Costs of Antipsychotic Medication." This paper deals with various drug doses and how they relate to chlorpromazine.

Dr. Davis testified that the patient was receiving what he considered to be a high dose of various types of medication; in one instance, he was given over three times the average dose. However, he stated, many textbooks advocate higher doses. He also testified that although a patient is given three times the average dose, this does not necessarily mean there will be three times better results. He stated he had never heard of any person being kept in restraints for many days and the length of time is limited by the Mental Health Code. His testimony differed sharply with the testimony of the doctor called by Claimant.

Dr. Davis testified that he believes home visits are important for the patient, and the fact that the deceased had asked to leave the ward on the day he met his death

would not necessarily alert the nurses to a possible suicide.

The last witness was Timothy Gawley who testified he had seen an individual near the railroad tracks which abut the Tinley Park Mental Health Center, and that he saw this man get hit by the train.

This Court has held, as have other courts, that before recovery can be made in cases like this, Claimant must prove there was a lack of proper and reasonable care. The courts have also held that Respondent cannot be held liable unless it knew, or should have reasonably been expected to know of or to predict decedent's sudden escape. *Karulski v. Board of Trustees* (1966), 25 Ill.Ct.Cl. 296; *Slater v. Missionary Sisters of the Sacred Heart* (1974), 20 Ill. App. 3d 464, 314 N.E. 2d 715.

The courts have held that where a Claimant fails to prove by a preponderance of the evidence that Respondent did not exercise the degree of care owed to its patient, the claim will be denied. *Gianos v. State* (1975), 30 Ill.Ct.Cl. 373; also *Krulfki v. State*, 25 Ill.Ct.Cl. 296.

In reviewing the records in this case, it appears we are dealing with an individual whose main interest in life was to be able to play basketball professionally. That he was unable to do so had a profound effect on him.

It is interesting to note that this individual, when he felt an attack coming on, would ask to be placed in restraints without showing any physical evidence that said restraints were needed. On the day of his death, he had not indicated any desire for the restraints nor did his actions indicate he should be placed in restraints. He did not become agitated when he was refused permission to leave his ward but merely sat down in the T.V. area. His next move was when he suddenly bolted to the door when it was opened by one of the ward personnel.

The record is devoid of any evidence showing Respondent knew, or should have known, that this individual was contemplating an immediate act or a suicide attempt.

It is the opinion of this Court that the Claimant has not met the burden of proof that is required before an award can be made and that Respondent provided reasonable medical care and treatment to said patient.

Award denied.

## ORDER ON PETITION FOR EXTENSION OF TIME

HOLDERMAN, J.

This matter comes before the Court upon petition by Claimant for extension of time for filing petition for rehearing.

It is hereby ordered that Claimant's petition be, and the same is, granted, and Claimant is given until June 1, 1982, to file said petition for rehearing.

## ORDER ON MOTION TO CLOSE RECORD

HOLDERMAN, J.

This matter coming to be heard on the motion of Respondent to close the record herein, and it appearing to the Court that Claimant has received due notice of said motion, and the Court being fully advised in the premises;

It is hereby ordered that the motion of Respondent be, and the same is, hereby granted and the record on this claim is hereby closed.