(No. 90-CC-0656—)

GERALDINE P. HENLEY, Individually and as Special Administrator of the Estate of PATRICIA KALAFUT, Deceased, KAREN J. HENLEY, CHERYL L. ROCCHINO, and MICHELLE A. HENLEY, Claimants, v. ILLINOIS DEPARTMENT OF MENTAL HEALTH AND DEVELOPMENTAL DISABILITIES and HOWE DEVELOPMENTAL CENTER, Respondents.

*Opinion filed February 23, 1999.*

*Order on petition for rehearing filed February 29, 2000.*

RICHARD L. PULLANO, for Claimants.

JIM E. RYAN, Attorney General (GARY M. GRIFFIN, Assistant Attorney General, of counsel), for Respondents.

## OPINION

RAUCCI, C.J.

This matter comes to be heard on the claims of Geraldine P. Henley, individually, and as special administrator of the estate of Patricia Kalafut, deceased, Karen J. Henley, Cheryl L. Rocchino, and Michelle A. Henley, for personal injuries resulting in the death of Patricia Kalafut (hereinafter collectively "Claimants") due to the alleged

negligence of the State of Illinois by and through its agents and employees at the Illinois Department of Mental Health and Developmental Disabilities ("DMHDD") and Howe Development Center ("Howe") in Tinley Park, Illinois. All of the Claimants are close relatives of Patricia Kalafut and seek compensation for the loss of society resulting from an incident that occurred on January 29, 1989, leading to the death of Ms. Kalafut, a disabled person. Claimants assert that the negligent acts and omissions on the part of Howe employees on January 29, 1989, were the proximate cause of Patricia's death; specifically that, despite indications she would run away, Howe employees Ann Staples, Donna Jackson and Vivian Richards failed to prevent Patricia from fleeing her housing unit at the Howe facility and she was then injured and killed in an automobile accident.

The State asserts that all of the actions or inactions by its employees at Howe on January 29, 1989 were reasonable given the circumstances and that it fulfilled its duty of care to Patricia on that date; specifically that, the Howe employees provided adequate supervision of Patricia on January 29, 1989, and Patricia's behavior on that date did not place the on notice she intended to flee Unit 307.

To determine whether Claimants should succeed in their claims and be awarded compensation, two separate issues must be determined prior to any calculation of damages: (1) whether the State of Illinois owed Patricia Kalafut a duty specific to the circumstances of this case; and (2) whether said duty was breached in a manner which proximately caused her injuries and death. The Claimants bear the burden of establishing the existence of a duty, a breach of that duty and an injury that was proximately caused by the breach. *Thornburg v. State* (1986), 39 Ill. Ct. Cl. 139.

The Claimants must show that there was a lack of proper and reasonable care and that the Respondents knew or reasonably should have known of, or predicted, the decedent's sudden escape. See *Calvin v. State* (1982), 35 Ill. Ct. Cl. 611.

## Background

The record of proceedings in this matter is extensive, as are the exhibits produced in support of the parties' respective positions.

The basic facts are largely agreed upon, but the many details attendant to the unfortunate incident are greatly contested by the parties. Details thought to be significant will be referenced as necessary, but upon an extensive review of the transcript of the proceedings, the exhibits submitted therein and the briefs submitted by each party, the following facts are necessary to the consideration of this claim.

On January 29, 1989, Patricia Kalafut (hereinafter "Patricia") was a resident under the 24-hour care and supervision of Howe in Tinley Park, Illinois. Patricia had been permanently disabled and impaired from an early age but retained many physical and mental capabilities. For example: although non-verbal herself, she could understand and respond to verbal communications; she could feed, dress and wash herself; despite ambulatory limitations, she enjoyed nature walks, camping and playing certain games, and she could display and perceive certain emotions.

Since October 7, 1976, Patricia Kalafut had been a resident at Howe. On January 9, 1989, Patricia was one of ten residents residing in House 307, a part of Unit 3. The ten residents of House 307 were supervised by two Howe mental health technicians on consecutive eight hour shifts. In addition, a shift supervisor was responsible for oversight of the ten houses in a given unit.

A "Rules and Regulation" handbook was not submitted for review, but testimony established that the staff was expected to follow certain rules or protocols in their supervision of the residents. When "unusual" behavior of one of the residents was observed, a house staff technician was to contact the shift supervisor to determine the best course of action. This was particularly appropriate when one of the two staff technicians was scheduled to take their allowed break or was in some way occupied. However, the clinical meaning of "unusual" in a mental health setting was not explored in great detail.

The residents were not to be left unsupervised at any time. The residents were not locked in their houses per DMHDD policy. Although closely supervised, any given resident was not physically restrained in any manner from leaving the house, unless a special circumstance necessitated restraint. Howe also had a policy for additional attention or supervision to a resident with special needs or maladaptive behavioral patterns. This special supervision is called a "baseline" where the so-called maladaptive behavior would be closely observed and monitored for a period of time until the behavior was resolved or different care arrangements were undertaken. Patricia Kalafut was placed on two separate "baselines" for running away/unauthorized absence in the two years prior to January 29, 1989, but she was cleared from that baseline by Howe personnel and under no special restriction or supervision on January 29, 1989.

In addition, Howe had a protocol that was to be followed by staff members in the event of a missing resident or the unauthorized absence of a resident. The protocol provided that a staff member who discovered the unauthorized absence or missing resident was to initiate a telephone call to the switchboard operator. The switchboard

operator would then initiate a special "command conference call" whereby all telephones in the complex would ring in a special sequence announcing the emergency call and be responded to by all available personnel. The shift supervisor would determine from the response to the "command conference call" who was immediately available to search for the missing resident. It is inconclusive from the testimony presented whether this "command conference call" was ever initiated by Ann Staples or Vivian Richards.

On January 29, 1989, the staff technicians on duty in House 307 were Ann Staples and Donna Jackson. The shift supervisor was Vivian Richards. Ann Staples had worked at Howe for approximately 12 years and had known Patricia the majority of that time. On that date, Patricia was to take a home visit with her family. By all accounts, she was aware of the pending home visit and looking forward to it. At approximately 5:00 p.m.,[1] her family telephoned Howe and canceled the home visit. Patricia spoke with her family on the telephone regarding the cancellation and was observed to be hyper and agitated afterward. At the time of that telephone call, Patricia and the other nine residents of House 307 were doing "tabletop" activities. After the call, she returned the telephone book she was working on to the closet and put on her coat and boots. For a long period of time, Patricia whined aloud and paced rapidly about House 307; and in particular, she focused her attention on the large window at the front of the house by repeatedly standing before it and looking outside toward a parking lot. Ann Staples observed Patricia's behavior and attempted to calm her. Ann Staples requested that Patricia remove her coat and sit

---

[1] By other conflicting accounts, the telephone call was placed at closer to 6:00 p.m.; however, contemporaneous reports of the incident indicate the call occurred at around 5:00 p.m. which is corroborated by Patricia's mother, Geraldine Henley.

down, but she was largely unsuccessful. Ann Staples realized in view of Patricia's behavior that she was unhappy she would not be going for a home visit. This was the *first time* that a home visit had been canceled by Patricia's family.

To Ann Staples, the agitated behavior of Patricia was not unusual as she had observed such behavior on many prior occasions. The numerous progress notes documenting Patricia's care at Howe corroborated Ms. Staples' testimony that similar behavior had been observed numerous times on days where Patricia did not attempt an escape.

At around 6:45 p.m., Donna Jackson took her break and left Ann Staples alone to supervise the ten residents of House 307. At approximately 6:55 p.m., Ann Staples heard the front door open and Patricia ran from House 307. Ann Staples, who had been seated at a table, ran to the door and called for Patricia to stop, which Patricia did momentarily before continuing out into the darkness in a southwesterly direction.

Ann Staples did not pursue Patricia due to the presence of the other nine residents in House 307. She immediately notified her supervisor Vivian Richards of the unauthorized absence.. When additional Howe personnel from House 310 came to supervise the remaining nine residents at House 307, Ann Staples began to search for Patricia in her car. In addition, Vivian Richards and another Howe employee joined the search immediately. Both Ann Staples and Vivian Richards claim to have directly or indirectly initiated a "conference call" prior to beginning their search, but no confirmation of the call was placed into evidence. The initiation or lack thereof of the "command conference call" was a point greatly contested by the parties, but there was no direct corroboration for either party's position.

Sadly, no Howe employee was able to locate Patricia before she was struck by an automobile on 183rd Street near the border to the Howe grounds. By the varying accounts, Patricia had been gone from House 307 for between five to fifteen minutes at the time she was struck by the automobile. Patricia Kalafut was transported to Olympia Fields Medical Center and pronounced dead at 7:38 p.m.

No issue was raised as to the qualifications or credentials of the Howe facility or any of the employees directly involved in this case.

No experts offered testimony on behalf of either party.

## Opinion

On January 29, 1989, Patricia Kalafut was a permanently impaired resident of Howe, but she retained many independent capabilities. Although her movements within the house where she resided were not restricted via physical restraints, she was supervised and monitored on a 24-hour basis by Howe personnel. It is undisputed that Howe and its personnel owed Patricia Kalafut a duty of reasonable care to protect her from incurring a foreseeable injury. (See generally, *Calvin v. State* (1982), 35 Ill. Ct. Cl. 611.) However, as stated previously, the Claimants not only bear the burden of establishing the existence of a duty, but also that a breach of that duty has occurred and an injury has resulted from that breach. See *Thornburg v. State* (1986), 39 Ill. Ct. Cl. 139.

In determining whether Howe breached its duty to Patricia Kalafut and if so, whether the breach caused her death, it is significant that there was no expert testimony presented in that regard. The Claimants repeatedly assert that numerous actions and inactions by Howe employees were unreasonable and were the proximate cause of the

death of Patricia Kalafut, yet they failed to present testimony through an expert that substantiates those assertions. No testimony establishes that the actions or inactions fell below the standard of care for the mental health industry given the situation such as existed on January 29, 1989. It is acknowledged that expert testimony is not required, but it is equally acknowledged that such testimony would have been very helpful in resolving the many questions left for us to resolve. In the absence of direct evidence to the contrary, the presumption must be that Howe acted reasonably, but an analysis must be undertaken to determine whether any reasonable inferences can be gleaned from the record that demonstrate otherwise.

For the sake of this decision, it is also conceded that in the absence of adequate supervision, an injury to a person/resident such as Patricia Kalafut was reasonably foreseeable. Therefore, our focus is necessarily on the question of whether the actions of the Howe employees were appropriate and reasonable during the period after Geraldine Henley called to cancel her home visit until the time when Patricia fled House 307.

Prior to January 29, 1989, Patricia Kalafut was known by Howe to have "run away" from the facility itself or from individual employees. In 1987 and 1988, she had "run away" from her supervisors at the facility on 11 occasions. "Running away" is considered maladaptive behavior by Howe and as a result of those incidents, Patricia Kalafut was placed on two separate "baselines" for that behavior. Patricia was observed and supervised more closely for that particular behavior during those "baseline" periods but she was not placed in any restrictive living situation or restrained in any manner different from the other nine residents of her house. She was not physically fettered nor was she kept in a "locked" environment.

Claimants contend that her past, known history of running away put Howe on notice of her intent to "run away" on January 29, 1989, thereby necessitating affirmative measures to prevent that action. This contention is simply not proven to the requisite certainty required by law.

After each of the "baseline" periods, Patricia was "cleared" of further restrictions or supervision for the "running away" behavior and was treated as any other resident. She was not considered a "runner" despite her history. The Respondent indicates that the decision not to restrain Patricia Kalafut, despite her history, was made by qualified psychiatric professionals and other personnel at Howe. No testimony was offered that Howe made an "institutional" mistake by taking Patricia off the "runner baseline." In the absence of any contradictory testimony, Howe's decision to treat Patricia in the manner she was being treated as of January 29, 1989, must be considered within the standard of care. This record does not support a conclusion that it was not within the standard of care.

In light of the above, the particular circumstances that occurred on January 29, 1989 must be analyzed to determine if any unreasonable conduct by the individuals Ann Staples, Donna Jackson and/or Vivian Richard proximately caused injury to Patricia Kalafut. On that date, Patricia Kalafut was upset that her mother was not coming to Howe to pick her up for a home visit. The testimony and evidence presented is clear that Ann Staples, Donna Jackson and Vivian Richards all observed Patricia's agitated behavior prior to her fleeing House 307. The testimony is also clear, however, that none of those persons expected Patricia Kalafut to flee House 307 into the dark night, despite their observations of her behavior. Ann Staples admitted that Patricia deserved more attention due to her behavior, but did not agree that said behavior put

her on notice of Patricia's impending flight. Ann Staples was not overly alarmed by Patricia's behavior because, per her own testimony and numerous progress notes identified by the Respondent, she was accustomed to Patricia exhibiting such behavior. In particular, Ann Staples associated such behavior with times before and after Patricia Kalafut's home visits. She did not identify Patricia's behavior as unusual conduct which would have necessitated review with a supervisor for a determination of action.

There was no evidence presented by Claimants that correlated Patricia Kalafut's past episodes of hyper-type behavior with episodes of running away. The Illinois State Police's Division of Internal Investigation explored a possible correlation between home visits and running away, but its results were inconclusive at best.

The actions of Donna Jackson and Vivian Richards were not a focus of Claimants' complaints and were reasonable given our analysis of the actions of Ann Staples, the central figure in this claim.

Claimants' position that Patricia Kalafut's behavior immediately after her mother's telephone call on January 29, 1989 up to the time she actually ran away from House 307 put the Howe employees on notice so that they should have restricted her access to the front door is not irrational; but neither is it adequately supported by the evidence necessary to carry the burden placed upon the Claimants by law. It is just as plausible that Ann Staples' attempts to calm Patricia Kalafut down and to allow her time alone to calm herself down was rational conduct given the particular situation and adequate given her duties owed the other nine residents of House 307. Ann Staples had cared for Patricia Kalafut during a large part of her 12 years at Howe and knew her very well. Her judgment on January 29, 1989, given the special situation

should not be discarded, particularly in light of the lack of testimony directly criticizing her decision(s). It is not sound public policy to impose an opinion of "unreasonableness" upon the actions of a qualified mental health staffer when no contrary testimony of any well-qualified mental health personnel was presented.

We must also address the Claimants' allegation that Howe's failure to follow its own security procedures resulted or contributed to the death of Patricia. The Claimants allege that if all the procedures had been followed, "Patricia would easily have been caught." This assertion is unsupported by solid evidence and cannot be resolved in Claimants' favor.

The Claimants and the Respondent cite numerous Court of Claims decisions in support of their respective positions. All of those cases are factually distinguishable from the present matter, but the standard of review provided remains fundamentally unchanged.

In the present matter, the Claimants have failed to carry their burden of proving that negligent conduct in breach of a duty owed to Patricia Kalafut proximately caused the injuries resulting in her death. As such, their claim for damages is denied.

It is therefore ordered, adjudged and decreed that this claim is dismissed and forever barred.

## ORDER

RAUCCI, C.J.

This cause comes on to be heard on Claimants' petition for rehearing following our opinion entered on February 23, 1999. Claimants' petition was argued before the full Court on August 24, 1999.

We have carefully considered Claimants' petition and the rather extensive record herein. Claimants have raised no issues which were not previously considered by the Court but argue that the Court erred in its assessment of the testimony and evidence herein to find Respondents negligently breached its duty owed to Patricia Kalafut and proximately caused the injuries resulting in her death.

We find that the Claimants have not proven their burden that Respondents acted negligently and breached a duty owed to decedent which proximately caused Ms. Kalafut's injuries by a preponderance of the evidence.

The Claimants assert that pursuant to *Mizowek v. De-Franco* (1976), 64 Ill. 2d 303, 1 Ill. Dec. 32, 356 N.E.2d 32 a new hearing is required for Claimants. In *Mizowek*, the Supreme Court found that the jury's verdict was contrary to the manifest weight of the evidence and a new trial should have been granted. In our matter, however, this Court is charged with determining the credibility of the witnesses and the weight to be afforded the testimony. Claimants fail to provide substantive inconsistencies in the testimony of Ann Staples or any other witness to warrant a rehearing. The inconsistencies must be substantial and related to a material issue and not a collateral or irrelevant matter.

Ann Staples testified as to numerous instances where Patricia Kalafut became aggressive, agitated or "hyper" that never led to Patricia Kalafut's attempted flight or actual flight from the facility. Ms. Staples' testimony is unrefuted. Although she believed Ms. Kalafut's behavior deserved more attention, Ms. Staples, in her experience, did not equate this behavior with notice of Ms. Kalafut's impending flight. Ms. Staples, through her long relationship with Ms. Kalafut and experience in her field

did not believe the behavior exhibited necessitated a review with a supervisor for a determination of action.

Claimants' witnesses did not adduce evidence that would support a finding that Respondents engaged in a negligent course of conduct which breached a duty owed to Patricia Kalafut proximately causing the injuries and resulting in Ms. Kalafut's death.

Wherefore, we must affirm our prior opinion denying these claims and Claimants' petition for rehearing is hereby denied.